PACIFIC MARITIME ASSOCIATION,
Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America, Respondents, Council of North Atlantic Shipping Association, Ports of Anacortes, et al., Intervenors.

INTERNATIONAL LONGSHOREMEN'S
AND WAREHOUSEMEN'S
UNION, Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents.

Nos. 75–1140, 75–1215.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 27, 1976.

Decided Aug. 27, 1976.

**396**

R. Frederic Fisher, San Francisco, Cal., with whom Edward D. Ransom, San Francisco, Cal., was on the brief for petitioner Pacific Maritime Ass'n. Harold E. Mesirow, Washington, D. C., also entered an appearance.

Norman Leonard, San Francisco, Cal., for petitioner Intern. Longshoremen's & Warehousemen's Union.

Robert J. Wiggers, Atty., Dept. of Justice, Washington, D. C., with whom James L. Pimper, Gen. Counsel, Edward G. Gruis, Deputy Gen. Counsel, Gordon M. Shaw, Atty., Federal Maritime Com'n and Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondents.

C. P. Lambos, New York City, was on the brief for intervenor Council of North Atlantic Shipping Ass'ns.

Alex L. Parks and Garry R. Bullard, Portland, Or., were on the brief for intervenor Ports.

Before WRIGHT, McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

This appeal constitutes the most recent controversy in a series of cases exploring the jurisdictional overlapping of shipping, labor and antitrust concerns in collective bargaining agreements within the shipping industry. At issue in the controversy is applicability of the pre-implementation filing and approval procedure of section 15 of the Shipping Act of 1916 to a collective bargaining agreement between the union and a multi-employer bargaining unit. The Federal Maritime Commission (FMC or Commission) held a portion of the agreement affecting employers who are not members of the Pacific Maritime Association (PMA) to be outside the labor/antitrust exemption and thus subject to filing with and approval or disapproval by the FMC. Recognizing that the reconciliation of the competing policies and statutory schemes is a difficult one, we nonetheless believe the prior-restraint procedures of section 15 impose such an extraordinary burden on collective bargaining that the dividing line must be drawn between labor-related agreements among employers, which are subject to section 15, and direct agreements negotiated between union and management, which we hold to be outside the scope of that section. For the reasons which follow, we remand to the Federal Maritime Commission.

## I. FACTUAL BACKGROUND

PMA is an employers' collective bargaining association representing numerous Pacific Coast employers of dockworkers. The International Longshoremen's and Warehousemen's Union (ILWU), which repre-

sents dockworkers hired not only by PMA but also by nonmember employers, bargains separately with the multi-employer unit and with individual nonmember ports. At issue in this appeal are 1972 and 1973 agreements negotiated [1] by PMA and ILWU regarding nonmember use of dockworkers jointly registered and dispatched through ILWU–PMA hiring halls to both PMA and nonmember employers. Prior to this agreement, nonmember employers negotiated separate labor agreements with ILWU; they also obtained separate agreements with PMA which allowed them to use the hiring halls and the complex accounting and pay offices [2] maintained by PMA. Under these separate agreements, nonmembers paid fringe benefit fund contributions and a participation fee [3] to the PMA for whichever of the fringe benefit programs [4] settled upon in their ILWU contracts. In addition to the differences in fringe benefit plans between PMA and nonmember collective bargaining agreements, there were other substantial labor variances. For example, nonmembers often negotiated steady workgangs rather than the rotation of workers generally required for PMA employers. In addition, the practice of negotiating separate labor agreements had enabled the union in the past to whipsaw by striking PMA but continuing to work for nonmembers.

At the beginning of negotiations for the 1972 collective bargaining agreement, the union demanded PMA to accept all fringe benefit contributions from any employer. In contrast, PMA proposed elimination of all nonmember participation in the fringe benefit fund. J.A. at 170. When the parties failed to reach agreement on other direct economic issues, ILWU went on strike. Several months later the union and PMA executed a memorandum of understanding resolving some terms in dispute and listing some 11 others to be resolved by further negotiation, mediation or arbitration; the list included resolution of the nonmember participation dispute. Within three months PMA and the union issued Supplemental Memorandum of Understanding No. 4, the agreement primarily at issue in this appeal.[5] In the Supplemental Memorandum the parties agreed that PMA would accept contributions from all nonmembers who executed a uniform participation agreement. This standard agreement, included in the Supplemental Memorandum, would require nonmembers, as a condition of using the joint dispatching halls for jointly registered employees, to participate in all fringe benefit programs,[6] pay the same dues and as-

1. The FMC made no findings of fact as to whether the agreement was a result of "eyeball to eyeball" good faith bargaining. Pacific Maritime Ass'n., Doc. No. 72–48 (FMC, Jan. 30, 1975), J.A. at 523. Although the FMC has denigrated the union's interest in obtaining uniform fringe benefits and access for all employees to joint hiring hall accounting procedures— conclusions which we find highly questionable—the affidavits of both petitioner ports, J.A. at 86–87, and PMA, J.A. at 183–88, 194–203, reveal a history of collective bargaining over nonmember participation and a concrete controversy between PMA and the ILWU in 1972 which was resolved by negotiation and compromise.

2. Because jointly registered employees work varying hours for separate employers, not all of whom have agreed to identical fringe benefits, the dispatch and accounting procedures require detailed record-keeping. *See* J.A. at 134. *See also* C. Larrowe, Shape-Up and Hiring Hall, chs. 5–6, at 139–83 (1955).

3. The participation fee represented administrative costs of the individual fringe benefit, not of the entire hiring hall. PMA Br. at 7; *compare* J.A. at 11–13.

4. Fringe benefits include a vacation plan, pay guarantee plan, pension plan, welfare plan, and a holiday plan. ILWU Br. at 16 note.

5. PMA has strongly contested the FMC finding that the Revised Agreement of 1973 is substantially the same as Supplemental Memorandum of Understanding No. 4. J.A. at 347–50.

6. 7. The nonmember participant shall participate in the ILWU–PMA Pension Plan, the ILWU–PMA Welfare Plan, the PMA Vacation Plans (longshoremen and clerks, and walking bosses/foremen) and the ILWU–PMA Guarantee Plans (longshoremen and clerks/ and walking bosses/foremen) in accordance with the terms applicable to such participation. Such nonmember shall make payments into these Plans at the same rates and at the same times as members of PMA

sessments as PMA members,[7] use steady men "in the same way a member may do so,"[8] and be treated as a member during work stoppages.[9]

Several municipal corporations which own and operate Pacific Coast facilities and which are not members of PMA filed a petition with the Commission seeking investigation of Supplemental Memorandum of Understanding, No. 4[10] and rulings that the agreement was subject to filing and approval under section 15 of the Shipping Act and was violative of sections 15, 16 and 17 as unjust, discriminatory and contrary to the public interest. After PMA filed the Nonmember Participation Agreement with the Commission, the FMC severed, for expeditious resolution, the issue of jurisdiction under section 15 (and a possible labor exemption) over the master collective bargaining agreement, Supplemental Memorandum No. 4, and underlying agreements among PMA members.

Although the agreement appeared to be outside the labor/antitrust exemption, the Memorandum of Law of Hearing Counsel of the FMC found:

> [T]he subject agreements involve antitrust and related labor policies and require a determination whether parties engaged in collective bargaining have exceeded the scope of legitimate bargaining. For these reasons, we submit, these matters ought to be left to the courts and the NLRB who are equipped to cope with them.

J.A. at 77–78. The Memorandum also suggested that should the courts find the agreements lawful under antitrust principles, actual practices implementing them might still violate sections 16 and 17. *Id.* The parties then responded with memoranda of law and affidavits in which they expressed counter allegations and denial of a conspiracy between PMA and ILWU "to eliminate outside competition either by

---

are to make the respective payments. Attached are statements of terms and conditions currently in effect with respect to such participation. Non-member Participants shall be subject to the same audits as members of PMA.
Revised Agreement ¶ 7, J.A. at 453. *See also* Supplemental Memorandum No. 4 ("S.M.4") ¶ 4, J.A. at 425.

7.    9. Each nonmember participant shall pay to the PMA an amount equal to the dues and assessments on the same basis that a PMA member would pay. Payments shall be made at the same time the member would pay.
Revised Agreement ¶ 9, J.A. at 453. *See also* S.M.4 ¶ 6, J.A. at 426.

8.    5. A nonmember participant may obtain and employ a man in the joint work force on a steady basis in the same way a member may do so. When such participant employs a man to work on a steady basis, it shall notify PMA immediately. On request from PMA, each such participant shall furnish to PMA a list of men it is using on a steady basis. Steady men shall participate in the Pay Guarantee Plan in accordance with the rules that are adopted by PMA and ILWU.
Revised Agreement ¶ 5, J.A. at 453. *See also* S.M.4 ¶ 3a, J.A. at 425.

9.    3. A nonmember participant will share in the use of the joint work force upon the same terms as apply to members of PMA. For example

a) the nonmember participant shall obtain men on the same basis as a PMA member from the dispatch hall operated by ILWU and PMA through the allocation system operated by PMA,

b) if a work stoppage by ILWU shuts off the dispatch of men from the dispatch hall to PMA members, nonmember participants shall not obtain men from the dispatch hall,

c) if during a work stoppage by ILWU, PMA and ILWU agree on limited dispatch of men from the dispatch hall for PMA members, such limited dispatch shall be available to nonmember participants.

The essence of b) and c) of this section is the acceptance by nonmember participants of the principle that a work stoppage by ILWU against PMA members is a work stoppage against nonmember participants.
Revised Agreement ¶ 3, J.A. at 452. *See also* S.M.4 ¶¶ 8–10, J.A. at 426–27.
The Revised Agreement also required uniform terms regarding selection of men in the joint work force, continuance of obligation to pay PMA assessments, and use of uniform payment and record forms.

10. The Commission's first order established an investigation as to any violations of sections 15, 16 and 17 by those agreements "between and among members of PMA" which were embodied in the collective bargaining agreement and the Supplemental Memorandum. 37 Fed. Reg. 18495 (1972); J.A. at 12.

withholding labor or by forcing outside employers into PMA membership." J.A. at 297. Hearing Counsel concluded again that the problem raised

> issues primarily of a labor and antitrust nature and that if the Commission pursued the investigation it would become enmeshed in areas foreign to its expertise. Furthermore, such an investigation would serve to impede the parties seeking relief in the pending antitrust cases before the courts.

*Id.* at 301.[11]

During the pendency of the proceedings before the Commission, PMA and ILWU began negotiations on a new agreement. The new Memorandum of Understanding (June 24, 1973) included as Article IX a revised ILWU–PMA Nonmember Participation Agreement containing provisions similar to those challenged in the 1972 Supplemental Memorandum. The Commission then amended the scope of its proceedings to include this 1973 agreement. 39 Fed. Reg. 4506 (1974).

One year later, in January of 1975, the Commission served its Report and Order in this case. The FMC rejected the Memorandum of Hearing Counsel and found instead that the revised agreement, *i. e.* Article IX of the 1973 collective bargaining agreement, is an "agreement" subject to FMC filing and approval. Applying the standards articulated in *United Stevedore Corp. v. Boston Shipping Association*, 16 F.M.C. 7 (1972), the Commission found the agreement to be outside the protection of a labor exemption to the Shipping Act and ordered an investigation to determine whether the agreement should be approved and whether

the master collective bargaining agreement would violate sections 16 and 17. PMA and ILWU then appealed to this court.

## II. LEGAL BACKGROUND

Before resolving the issues in this case we turn briefly to the three lines of cases which converge in the jurisdictional dispute before us. The first line of cases reflects the tension created by the special shipping considerations in maritime antitrust litigation. The second examines and attempts to reconcile the disparate aims of national labor policy and antitrust laws. The final series of cases deals with implications of Shipping Act regulation on collective bargaining.

### A. Antitrust/Shipping Act

By the beginning of the twentieth century Congress had recognized the need for special legislation to prevent monopolies and unlawful restraints. The Interstate Commerce Act of 1887 and the Sherman Anti-Trust Act of 1890 attempted to limit corporate evils such as price-fixing and restrictive agreements. These legislative efforts to prevent abusive practices continued in 1914 with the adoption of the Clayton Act and Federal Trade Commission Act.

It was during this same period of increased interest in freedom of competition that Congress undertook an extensive study into the antitrust problems rampant in the maritime industry. The Shipping Act of 1916, now administered by the Federal Maritime Commission, was aimed at abuses in both domestic and foreign shipping caused by secret anticompetitive agreements[12] be-

---

11. The pending antitrust cases to which Hearing Counsel refers were discussed at length in his first Memorandum, J.A. at 57–61. In the first case, *Port of Anacortes v. PMA and ILWU,* Civil No. 72–618 (D.Ore., filed Aug. 2, 1972), eight ports challenge Supplemental Memorandum No. 4 under the antitrust laws. The second case, brought by the Port of Longview, makes basically the same allegations of antitrust conspiracy violations. *Port of Longview v. PMA and ILWU,* Civil No. 72–626 (D.Ore., filed Aug. 3, 1972). The third case added to the general antitrust claims a chal-

lenge to the collective bargaining agreement provision concerning containerized shipments. *Port of Seattle v. PMA,* Civil No. 214–72C2 (W.D.Wash., filed Apr. 4, 1972). All three cases were stayed pending Commission determination of the status of the agreements under the Shipping Act.

12. These agreements and conferences engaged in price fixing, discriminatory rates, limiting sailings by certain lines or from certain ports, freight volume restrictions, tariff pooling, and assessing fines for assistance to non-conference lines. In addition, they fought outside

tween shippers. Recognizing the beneficial aspects [13] of many agreements, Congress accepted a compromise: in order to participate in cooperative working arrangements shippers would have to submit the arrangements for approval by the federal regulatory agency before implementation.

Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter . . . fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements.

The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair . . . or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations.

. . .

Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation; except that tariff rates, fares, and charges, and classifications, rules, and regulations explanatory thereof . . . . .

46 U.S.C. § 814 (1970). In this way Congress attempted to preserve general principles of competition without eviscerating efforts of the nation's shipping lines to compete internationally. Although the desired agreements increased the prospects for fair competition within the specialized conditions of the shipping industry, they necessarily violated basic principles of general antitrust laws. Congress therefore created an exemption for approved plans:

Every agreement, modification, or cancellation lawful under this section . . shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto.

46 U.S.C. § 814 (1970).

Numerous Supreme Court cases interpreting section 15 have considered the interaction between the Shipping Act exemp-

competition by giving tariff rebates or by using "fighting ships" subsidized by the conference to destroy a single competing line. H.R.Doc. No.805, 63d Cong., 2d Sess. 281–95 (1914) ("Alexander Report").

13. It is claimed that the adoption of the first course—the prohibition of cooperative arrangements between practically all the lines in nearly all the divisions of our foreign trade—would not only involve a wholesale disturbance of existing conditions in the shipping business but would deprive American exporters and importers of the advantages

claimed as resulting from agreements and conferences if honestly and fairly conducted, such as greater regularity and frequency of service, stability and uniformity of rates, economy in the cost of service, better distribution of sailings, maintenance of American and European rates to foreign markets on a parity, and equal treatment of shippers through the elimination of secret arrangements and underhanded methods of discrimination.

H.R.Rep.No.659, 64th Cong., 1st Sess. 28 (1916), *quoting* Alexander Report at 416.

tion and the antitrust laws. Recognizing the expertise of "an administrative body especially trained and experienced in the intricate and technical facts and usages of the shipping trade," the Court declared that the Shipping Board, predecessor of the FMC, had primary jurisdiction in a case seeking a Clayton Act injunction against unapproved agreements with alleged antitrust consequences. *United States Navigation Co. v. Cunard Steamship Co., 284 U.S. 474, 485, 52 S.Ct. 247, 76 L.Ed. 408 (1932).* See also Far East Conference v. United States, *342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952). This concept of primary jurisdiction was defined more narrowly in* Carnation Co. v. Pacific Westbound Conference, *383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), where the Court stressed the limited nature of the antitrust exemption created by the Shipping Act and, distinguishing* Cunard *and* Far East, *held that a suit for treble damages for antitrust violations under an unapproved conference agreement would lie in district court. The Court stressed that since the Commission could approve these agreements only prospectively, awarding treble damages for completed conduct would not interfere with the Commission's future actions. 383 U.S. at 220–22, 86 S.Ct. 781.*

In addition to these primary jurisdiction cases, suits involving the proper standards for approving section 15 agreements have led the Court to consider applicability of antitrust principles to Shipping Act concerns. In *FMC v. Aktiebolage Svenska Amerika Linien,* 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968), the Court recounted the historical development of the Act and determined that antitrust violations could serve as a basis for disapproving agreements under the "contrary to the public interest" language added to section 15 in 1961.[14] "Congress has, it is true, decided to confer antitrust immunity unless the agreement is found to violate certain statutory standards, but as already indicated, antitrust concepts are intimately involved in the standards Congress chose." 390 U.S. at 245, 88 S.Ct. at 1009. In addition the Court has refused to expand potential antitrust immunity for agreements not clearly covered under section 15's emphasis on on-going arrangements. *FMC v. Seatrain Lines, Inc.,* 411 U.S. 726, 733 & n. 8, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973) (acquisition-of-assets agreements).

These cases reveal the Court's acknowledgment of the delicate balance which Congress struck between the national economic policy of fair competition and the specialized needs of the shipping industry. This balance has become even more precarious when the labor factor also must be fitted into the jurisdictional equation.

### B. *Labor/Antitrust*

While the paths of antitrust and the Shipping Act policies have sometimes diverged, those of labor and antitrust have consistently collided head-on. In the early years of this century, attempts to organize labor were frequently defeated in the legal forum by application of antitrust laws. *See, e.g., Bedford Cut Stone Co. v. Stone Cutters' Association,* 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927); *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921); *Loewe v. Lawlor,* 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908). This historical animosity resulted from two opposing objectives: antitrust laws sought to promote competition while unions strove to eliminate wage competition through collective bargaining.[15] Congress

---

14. "The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement . . . that it finds to be unjustly discriminatory or unfair . . ., or to operate to the detriment of the commerce of the United States, or *to be contrary to the public interest,* or to be in violation of this chapter . . . ." 46 U.S.C. § 814, *as amended,* Pub.L.No.87–346 (Oct. 3, 1961) (emphasis added).

15. The result of all this is that we have two declared congressional policies which it is our responsibility to try to reconcile. The one seeks to preserve a competitive business economy; the other to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining. *Allen Bradley Co. v. Local 3, IBEW,* 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939 (1945).

recognized these objectives and attempted to foster the national objective of collective bargaining[16] by providing a statutory labor exemption in the Clayton Act[17] and by regulating the bargaining process through various provisions of the National Labor Relations Act.[18] In addition the courts have developed a non-statutory labor ex-emption to the antitrust laws. *See Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).

Beginning with *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), the Court held that a violent primary sit-down strike did not violate the

Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws.

*Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975).

**16.** *See, e. g.*, 29 U.S.C. § 102 (1970):

Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

**17.** The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purpose of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

15 U.S.C. § 17 (1970). *See also* 29 U.S.C. § 52 (1970):

No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

And no such restraining order or injunction shall prohibit any person or persons whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; or shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States.

and 29 U.S.C. § 101 (1970):

No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

**18.** *See, e. g.*, 29 U.S.C. § 158(b)(4) (regulating union secondary activities); § 158(e) (prohibiting hot cargo clauses).

Sherman Act. The broad language [19] of the case limiting the Sherman Act's scope as to price effects of labor negotiations was gradually disavowed, however, as the Court evolved an ad hoc definition for this non-statutory exemption.

Although union picketing and product boycott within a labor jurisdictional dispute were exempt activities,[20] *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), combining with businessmen to create a geographical monopoly benefitting both labor and management was not protected. *Allen Bradley Co. v. Local 3, IBEW*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). While the Court assumed that the bargaining agreements in which the union persuaded employers not to buy goods manufactured by employees not members of its local would not have violated the Sherman Act, the union had also joined in a manufacturer/contractor plan to bar all other businessmen from New York in order to charge exaggerated prices. This combination was not within the exemption to the antitrust laws.

In 1965 the Court further refined the non-statutory exemption standards. The United Mine Workers forfeited their exemption by agreeing with the large mine owners in a multi-employer unit to impose a certain wage scale on small or owners, even though the terms imposed were mandatory bargaining topics. *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85

S.Ct. 1585, 14 L.Ed.2d 626 (1965). The union (which also had invested in certain mines) had compromised its demands against mechanization and control of working time in order to obtain industry-wide wage increases. The facts showed a pattern of union-owner cooperation to drive small owners out of the coal market. The major defect in the union's behavior was its *agreement* to impose "specified labor standards outside the bargaining unit . . . For the salient characteristics of such agreements is that the union surrenders its freedom of action with respect to its bargaining policy." *Id.* at 668, 85 S.Ct. at 1592.

In a companion case to *Pennington*, however, the Court upheld a strike-coerced agreement in which the butchers' union obtained the same marketing hours restriction from Jewel Tea Co. that it had negotiated with a multi-employer bargaining group. *Local 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Three Justices—White, Warren and Brennan—stressed the fact that the trial court found no evidence of a conspiracy and that, since butchers would be required for night operations, the union's interest in working hours created a legitimate concern in marketing hours as well. *Id.* at 692, 85 S.Ct. 1596. Justices Goldberg, Harlan and Stewart agreed with the result in *Jewel Tea*, but dissented from denial of the exemption in *Pennington*. For these jurists,

---

**19.** Strikes or agreements not to work, entered into by laborers to compel employers to yield to their demands, may restrict to some extent the power of employers who are parties to the dispute to compete in the market with those not subject to such demands. But under the doctrine applied to non-labor cases, the mere fact of such restrictions on competition does not in itself bring the parties to the agreement within the condemnation of the Sherman Act. Furthermore, successful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. Since, in order to render a labor combination effective it must eliminate the competition from non-union made goods, an elimination of price competition based on differences in

labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act.

*Apex Hosiery Co. v. Leader*, 310 U.S. 469, 503–04, 60 S.Ct. 982, 997, 84 L.Ed. 1311 (1940) (citations omitted).

**20.** So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 [of the Clayton Act] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.

*United States v. Hutcheson*, 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941).

national labor policy required an exemption for "collective bargaining activity concerning mandatory subjects of bargaining under the Labor Act . . . ." *Id.* at 710, 85 S.Ct. 1596, 1614. Justice Douglas, with whom Justices Black and Clark joined, dissented in *Jewel Tea* on the grounds that the multi-employer collective bargaining agreement was itself evidence of a conspiracy between labor and management to impose marketing terms on other employers. *Id.* at 736, 85 S.Ct. 1596.

Just last term the Supreme Court again attempted to define with more precision the landmarks by which bargaining parties and lower courts can find their way through the obscurities of the labor/antitrust labyrinth. The Court found that a plumbing and mechanical workers union could not obtain its legitimate goal of organizing as many subcontractors as possible by compelling a "stranger"[21] general contractor to agree to use only subcontractors hiring the union's members. *Connell Construction Co. v. Plumbers & Steamfitters Local 100, supra.* This direct restraint on competition would eliminate competition based on efficiency and was not a natural consequence of elimination of competition over wages and conditions.[22] *Id.* at 623, 625, 95 S.Ct. 1830. While the general contractor had not argued that the union had conspired with organized subcontractors, the Court did observe that a "most favored nation" clause in the multi-employer bargaining agreement "enhanc[ed] the restraint of trade". *Id.* at

625 n.2, 95 S.Ct. 1830. It thus appears that the Court has dispensed with the requirement of conspiracy for subjecting union activity to antitrust litigation,[23] at least outside employer-employee bargaining. *See also* 61 Cornell L.Rev. 436, 448 n.63 (1976); 50 Tulane L.Rev. 418, 426 (1976).

### C. *Labor/Shipping*

We turn now to a series of cases in which the Federal Maritime Commission has attempted to apply the vagaries of labor/antitrust principles to agreements affecting labor relations within the shipping industry.

Prior to 1968, the FMC had resisted the concept that it had jurisdiction under section 15 over agreements affecting employer-employee relationships. The Supreme Court, however, in 1968 overruled the FMC and this court as to the applicability of the Shipping Act's pre-implementation procedures to an agreement *among PMA members* which formulated assessments for the establishment of a $29,000,000 fund that had already been negotiated with the ILWU. *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). Despite warning by Justice Douglas that this employer agreement, although outside employer-employee negotiation processes, was intimately related to labor relations, *id.* at 296–313, 88 S.Ct. 929, the majority relied on the broad language of section 15 regarding any "cooperating working arrangement" to determine that the FMC had jurisdiction under section

---

21. The union had disclaimed any interest in representing Connell's employees. This factual aspect of the case is highly relevant since the Court determined that section 8(e) of the National Labor Relations Act allows a subcontracting agreement "within the context of a collective-bargaining relationship." 421 U.S. at 627, 95 S.Ct. 1830, 1837. Even more important is the Court's suggestion that within a collective bargaining setting, labor policies may weigh more heavily.

There can be no argument in this case, whatever its force in other contexts, that a restraint of this magnitude might be entitled to an antitrust exemption *if it were included in a lawful collective-bargaining agreement.* *Id.* at 625–26, 95 S.Ct. at 1836 (emphasis added).

22. Furthermore, the coercive secondary strike was not subject only to the special remedies of the National Labor Relations Act since the violation at issue related to section 8(e) regarding hot cargo clauses rather than 8(b)(4) limiting secondary activities. *Id.* at 633–35, 95 S.Ct. 1830. *Contra, id.* at 639–55, 95 S.Ct. 1830. (Stewart, J., dissenting). *See also* St. Antoine, *Connell: Antitrust Law at the Expense of Labor Law,* 62 Va.L.Rev. 603, 627–28 (1976).

23. The Court held only that the agreement was subject to antitrust litigation, not that it actually violated the Sherman Act. 421 U.S. at 637, 95 S.Ct. 1830.

15 to approve, disapprove or modify the agreement, and that the fee assessment also might violate sections 16 and 17. Of particular concern was the disproportionate cost of automobile shipping, a cost passed on to the manufacturer despite the minimal benefit received. *Id.* at 281–82, 88 S.Ct. 929.

The second step leading to the present controversy involved an attempt by the FMC to assert jurisdiction over a labor allocation agreement among members of the multi-employer unit and an employee assignment provision worked out later among employers and then embodied in the collective bargaining agreement. *United Stevedoring Corp. v. Boston Shipping Association,* 15 F.M.C. 33 (1971) (hereinafter *Boston I* ). On appeal the First Circuit expressed its "astonishment" at the Commission's action and remanded, noting the difference "between attaching a separate, section 15, agreement, in which the union had little interest, to a collective bargaining agreement, and making a multi-employer agreement with a union, eyeball to eyeball, but which, by the very fact that it is multi-employer, has some effect on employer competition." *Boston Shipping Association v. FMC,* Civil No. 72–1004 (1st Cir., filed May 31, 1972). The Commission upon remand examined the labor/antitrust cases and held that the same labor exemption applied to section 15 agreements. *United Stevedoring Corp. v. Boston Shipping Association,* 16 F.M.C. 7 (1972) (hereinafter *Boston II* ). Although "organic agreements of pure collective bargaining" would never require filing, a line would be drawn "where purely labor matters cease and shipping matters begin." *Id.* at 14. The Commission articulated a four-prong test,[24] no element of

which would be controlling, and found that both agreements before it were entitled to the exemption.

The following year the Commission again faced the interplay of labor agreements and shipping concerns. *New York Shipping Association,* 16 F.M.C. 381 (1973). At issue was an assessment formula for funding the fringe benefit program. Both the union and the multi-employer bargaining unit had negotiated the formula since prior assessment methods worked out by the employers had proven unable to assure fund security. Although the FMC claimed jurisdiction over the assessment formula, it granted interim approval so as not to "jeopardize relations between the NYSA and the ILA." *Id.* at 396. This decision was affirmed by the Second Circuit as merely an extension of the *Volkswagenwerk* holding. *New York Shipping Association v. FMC,* 495 F.2d 1215 (2d Cir.), *cert. denied,* 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974).

These cases have continued to cut ever finer the distinction between "organic collective bargaining agreements" and shipping cooperative arrangements. In the case before us, the FMC was compelled once again to draw the difficult line which reconciles Shipping Act policies with labor policies. *Boston II, supra,* 16 F.M.C. at 10. Although we sympathize with the Commission's herculean task of following "the rather imprecise guidelines of *Volkswagen,*" *id.* at 11, while avoiding intrusion into "the already strife-ridden maritime labor world," *id.* at 10, we do not believe that asserting jurisdiction under section 15 over the collective bargaining agreement before us is within the mandate of *Volkswagenwerk* or the structure of the Shipping Act.

---

**24.** 1. The collective bargaining which gives rise to the activity in question must be in good faith. Other expressions used to characterize this element are "arms-length" or "eyeball to eyeball".

2. The matter is a mandatory subject of bargaining, e. g. wages, hours or working conditions. The matter must be a proper subject of union concern, i. e., it is intimately related or primarily and commonly associated with a bona fide labor purpose.

3. The result of the collective bargaining does not impose terms on entities outside of the collective bargaining group.

4. The union is not acting at the behest of or in combination with nonlabor groups, i. e., there is no conspiracy with management. *United Stevedoring Corp. v. Boston Shipping Ass'n,* 16 F.M.C. 7, 13 (1972).

## III. RESOLUTION OF THE ISSUE

As the three lines of cases summarized above illustrate, application of the Shipping Act to collective bargaining agreements affecting employers outside the bargaining unit requires reconciliation of conflicting policies. We must, whenever possible, draw the line between shipping, labor and antitrust concerns in such a way that each statutory scheme remains effective.[25] In this case we believe that the jurisdictional boundary drawn by the FMC impinges unnecessarily upon collective bargaining processes. The FMC, recognizing the need for this balancing, has attempted to distill the essence of the judicially-developed antitrust exemption for labor and apply it to the Commission's jurisdictional bases in sections 15, 16 and 17. Were the procedures of section 15 the same as those of the antitrust laws we would agree that the transplanted exemption might well serve the aim of statutory reconciliation. The unique structure of the Shipping Act, however, makes this an unsatisfactory solution in several ways.

Unlike the antitrust laws, section 15 prescribes a procedure whereby agreements subject to the Act must be filed with the Commission *before implementation.* The legislative scheme is a sound one for assuring that agreements among carriers which fix rates, pool earnings, allocate ports, or limit traffic[26] must be approved or modified by the agency with an expertise in shipping matters. As the legislatively established regulator of maritime concerns, the Commission needs authority to postpone the effective date of such agreements pending full examination of their impact on the entire industry. The Federal Maritime Commission, however, is not in any way the congressional choice of regulator for labor relations within the shipping industry. In contrast, as pointed out by Justice Douglas

in *Volkswagenwerk*, the Maritime Labor Board created in 1938 was allowed to expire, and Congress has consistently refused to provide a specialized federal maritime labor agency. 390 U.S. at 299–301, 88 S.Ct. 929 (Douglas, J., dissenting). Subjecting negotiated labor agreements to filing and approval (or disapproval or modification) would place collective bargaining units in the shipping industry under more stringent federal regulation than other transportation industries and thus at a competitive disadvantage.

One obvious disadvantage to maritime labor of the FMC ruling is that the ruling would make nearly impossible the maintenance or prompt restoration of industrial peace. The history of Pacific Coast longshoremen bargaining is a story of great unrest. Continual "quickie strikes" during the 1930's and coast-wide shutdowns lasting several months in the 1940's were destructive to labor and management alike. *See* C. Larrowe, Shape Up and Hiring Hall ch. 4, 83–138 (1955). The nature of collective bargaining as it exists in this country today requires the ability of both sides to implement promptly the compromise agreements worked out in eleventh-hour bargaining sessions or, as in this case, in hard-fought negotiations following a strike and mediation. The facts of this case are illustrative of the problem: a labor agreement negotiated in 1972 and refined in 1973 has yet to be put into effect more than four years later. The problem is not one of dilatory agency action[27] or judicial backlog, but of procedures unsuited to collective bargaining. Labor peace, a national objective, cannot be furthered when the bargaining parties realize that their compromise solutions may be rejected in toto or, even worse, in a piecemeal fashion by a federal regulatory

---

**25.** " '[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective'." *Radzanover v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 1994, 48 L.Ed.2d 540, (1976), *quoting Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

**26.** 46 U.S.C. § 814 (1970), which appears *supra* in the text 177 U.S.App.D.C. at ——, ——, 543 F.2d at 399–400.

**27.** The Commission points out that PMA neither requested interim approval nor an expedited hearing. In fact, PMA and ILWU obtained extensions of time for filing briefs. FMC Memorandum of March 8, 1976, at 9 n.8.

agency whose primary concern is to foster trade competition.

Frustration of the collective bargaining process comes not so much from the possibility that one or more provisions in a collective bargaining pact might be found illegal at some future date under the antitrust laws, or other statutes such as §§ 16 and 17 of the Shipping Act, but rather from the undue and possibly lengthy freezing or stultification of solutions to troublesome labor problems . . . .

*Volkswagenwerk, supra,* 390 U.S. at 312, 88 S.Ct. at 956 (Douglas, J., dissenting).

In *New York Shipping Association, supra,* the FMC attempted to offset this disadvantage by granting a temporary approval of the assessment formula found to be within section 15 jurisdiction:

Labor peace is crucial to the well-being of our maritime industry, and we will take an action which disturbs the peace only when there are no other reasonable alternatives. Here, however, the course is clear, we will grant the assessment formula an interim approval . . . and we will condition our approval upon any adjustments which may be found necessary as a result of the proceeding which we have this day instituted [to determine if the agreement violates sections 16 and 17].

16 F.M.C. at 396. While such temporary approvals appear to alleviate partially the problem of delayed implementation, they would not solve the problem entirely. The power of the Commission to grant interim approval is currently being litigated. *Marine Cooks & Stewards Union v. FMC,* No.

75–2012 (D.C. Cir.). Even if this power is affirmed by the court, interim approval does not remove the possibility of later unilateral modification by the Commission and the resultant specter of a final agreement in which the delicate balance struck by the competing interests of labor and management is upset by partial invalidation of the collective bargaining terms.[28]

Section 15 jurisdiction also differs from antitrust procedures as to the penalties imposed. Bargaining agreements found to be outside the antitrust exemption face treble damages, no small deterrent to parties which stray too near the nebulous border between the legitimate bargaining and Sherman Act violations. Nevertheless, the penalty reflects the actual damages suffered, though multiplied in the reflection. In contrast, Shipping Act penalties may fall numerous times upon bargaining contracts. Under section 15 *failure to file* a covered agreement may result in a $1,000 per day fine. In addition, a civil penalty of $5,000 per day may be assessed for each violation of the provision against *discriminatory practices,* 46 U.S.C. § 815 (Supp. 1974), or *discriminatory rates,* 46 U.S.C. §§ 815, 831(a) (Supp. 1974). With FMC lightning threatening to strike twice in the same agreement, carrier employers[29] would no doubt err in favor of filing all agreements with potential anticompetitive results, thus further disrupting the course of negotiations. This is particularly true since the FMC, in recognizing the complexities of the labor/antitrust exemption, has stated that its four criteria are merely rules of thumb, that failure to meet any one of them *might* result in denial of the exemption, and that the determination will be made on a "case-

**28.** Another technique considered by the Commission was the recommendation of Hearing Counsel and the Department of Justice to exempt collective bargaining agreements from section 15 by means of a rulemaking proceeding. *Boston II, supra,* 16 F.M.C. at 15. Despite a promise that "[t]his we intend to do," no rulemaking has been forthcoming. Instead, the Commission has appeared to expand its claim of jurisdiction in *New York Shipping Association* and the case before us. *See* Pacific Maritime Ass'n, Doc. No. 72–48 (FMC, Jan. 30,

1975), J.A. at 533 n.20 (Morse, Comm'r, dissenting).

**29.** The FMC appears to be claiming jurisdiction over the agreement, but not over the union as a "common carrier by water or other person subject to this chapter." 46 U.S.C. § 814 (1970); FMC Memorandum, *supra* at 8 n.7. *See also* note 31 *infra; cf.* Pacific Maritime Ass'n, Doc. No. 72–48 (FMC, Jan. 30, 1975), J.A. at 533 n.19 (Morse, Comm'r, dissenting) ("ILWU is clearly neither of the described type of persons.").

by-case ad hoc basis." *See. e.g., Boston II, supra,* 16 F.M.C. at 12; *New York Shipping Association, supra,* 16 F.M.C. at 390; *Pacific Maritime Association,* Doc. No. 72–48 (FMC Jan. 30, 1975), J.A. at 522.

Such burdens should not be imposed lightly by either the Commission or the courts, particularly since congressional direction in the statute does not clearly require this result. The Supreme Court's decision in *Volkswagenwerk* construed section 15's definition of agreements broadly, stressing that the Alexander Report[30] intended government scrutiny of "the myriad of restrictive agreements". 390 U.S. at 276, 88 S.Ct. 929. That agreement, however, was one *among employers*: common carriers, stevedoring contractors and marine terminal operators.[31] The Court rejected the argument that filing of this separate employer contract would unjustifiably impinge upon labor concerns. The union had a substantial interest in setting the amount of the mechanization fund established by collective bargaining, but had agreed to leave to the association the method for assessing members their share of the cost. The Court cautioned, however, that

> [i]t is to be emphasized that the only agreement involved in this case is the one among members of the Association allo-

cating the impact of the Mech Fund levy. *We are not concerned here with the agreement creating the Association or with the collective bargaining agreement between the Association and the ILWU. No claim has been made in this case that either of those agreements was subject to the filing requirements of § 15. Those agreements, reflecting the national labor policy of free collective bargaining by representatives of the parties' own unfettered choice, fall in an area of concern to the National Labor Relations Board, and nothing we have said in this opinion is to be understood as questioning their continuing validity.*

390 U.S. at 278, 88 S.Ct. at 938 (emphasis added). To expand the holding in *Volkswagenwerk* to cover an agreement *negotiated between union and management* is to ignore the caveat of the Court and the legislative history of the Act. Although the Shipping Act did not pre-date collective bargaining in the maritime industry,[32] no mention of labor agreements appears in the discussion of problem agreements to be regulated by the federal agency. Instead, the Alexander Report stresses the need for supervision of "all agreements or arrangements which steamship lines may have entered into *with other steamship lines, with shippers, or with other carriers and trans-*

---

**30.** *See* text at note 12 *supra.*

**31.** An argument was made in *Volkswagenwerk* that the agreement was not within the statutory definitions of section 15 which covers agreements between "every common carrier by water, or other person subject to this chapter" and "another such carrier or other person subject to this chapter." *See Volkswagenwerk Aktiengesellschaft v. FMC,* 125 U.S.App.D.C. 282, 371 F.2d 747, 752 (1966). Section 801 provides in relevant part:

> The term "other person, subject to this chapter" means any person not included in the term "common carrier by water," carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water.

46 U.S.C. § 801 (1970). The Commission assumed that both PMA and Marine Terminals Corporation were covered by the definition, but denied section 15 jurisdiction over the agreement. In reversing, the Supreme Court was silent on the issue. This silence may reflect an

acceptance of the FMC assumption of coverage or the theory later propounded by FMC that the presence of a non-covered party in the agreement does not destroy jurisdiction *over the agreement. See New York Shipping Ass'n,* 16 F.M.C. 381, 388–89 (1973), *aff'd sub nom. New York Shipping Ass'n v. FMC,* 495 F.2d 1215, 1220 (2d Cir. 1974). *Contra United Stevedoring Corp. v. Boston Shipping Ass'n,* 16 F.M.C. 7, 17–21 (Morse, Comm'r, concurring and dissenting).

**32.** For example, unionization among New York longshoremen was sufficient in 1874 to organize a five-week strike seeking higher wages. By 1914, New York locals united within the International Longshoremen's Association and, by 1916, the ILA secured a port-wide agreement. Similarly on the West Coast, an agreement obtaining wage increases from all Seattle area employers was signed in 1915. C. Larrowe, Shape-Up and Hiring Hall, chs. 7–9, at 87–89 (1955).

*portation agencies."* Alexander Report, *supra* at 418 (emphasis added).

We are, of course, aware that our holding in this case creates a barrier between the FMC jurisdiction over labor-related agreements, as in *Volkswagenwerk*, and labor-management negotiated agreements. Justice Harlan, who foresaw the problem in his concurring opinion in *Volkswagenwerk*, felt that a labor agreement could raise both labor and shipping concerns. 390 U.S. at 291 n.7, 88 S.Ct. 929. He also recognized, however, that reconciling multi-employer collective bargaining and regulation of shipping competition is a problem of line-drawing. Judicial line-drawing is always a difficult task, and in areas of converging statutory schemes the differences between cases on either side of the line may be muted by the similarities. An argument can be made, undoubtedly, that a separation is arbitrary which permits the FMC to oversee employer agreements intended to fulfill a collective bargaining obligation but denies this approval procedure for the bargaining agreement itself. While we might prefer a rule that more adequately protects labor negotiations from the very real, if more distant, interference permitted in *Volkswagenwerk*, we see no valid purpose in extending that rule to encourage immediate disruption of negotiations. Exempting collective bargaining agreements as a class from section 15 is the best method to reconcile these conflicting labor and shipping objectives.

Even if we were to adopt the balancing test suggested by Justice Harlan, the agreement at issue would be exempt from filing. The agreement challenged in *Volkswagenwerk* assessed fees to employers on the basis of tonnage handled, tonnage being determined by weight or measurement depending upon the manifesting custom for each type of cargo. Almost all the employers passed these costs on to their customers, thus causing the assessment to fall disproportionately on shippers who transported automobiles by nonmember charter and common carriers. In this way, the agreement produced discriminatory tariffs—a primary concern of the Act—for the shipping of automobiles.[33]

In contrast, Supplemental Memorandum of Understanding No. 4 is challenged not because it will compel discriminatory rates, but because it will allegedly force nonmembers into accepting the same wage, fringe benefit and work stoppage terms as those negotiated by the multi-employer unit. Although the parties vigorously dispute the proper interpretation of the terms of Supplemental Memorandum No. 4 and the subsequent Revised Agreement,[34] as well as the intent[35] of the parties to the agreement, the nonmembers' argument boils down to an accusation that they are being forced against their wills into a multi-employer unit. FMC has thus accepted jurisdiction to determine shipping implications of an agreement which perhaps imposes an improper bargaining unit. We do not believe that the Shipping Act pre-implementation approval provision was intended

---

**33.** *Compare New York Shipping Ass'n v. FMC,* 495 F.2d 1215, 1220 (2d Cir. 1974) in which the union-labor agreement involved an assessment formula. While we agree with the Second Circuit that the contents are like those of the *Volkswagenwerk*, we cannot accept the conclusion that active negotiation of the agreement by the union is "a distinction without a difference." 495 F.2d at 1220. Unlike the Second Circuit we face not only a different type of agreement, *cf. id.* at n.11, but one which has been stalled for several years by FMC action.

We note also that, while the agreement in *New York Shipping* is similar in terms to one over which this court assumed jurisdiction, *see Transamerican Trailer Transport, Inc. v. FMC,* 160 U.S.App.D.C. 351, 492 F.2d 617 (1974), the

*Transamerican* decision involved the agreement between employers, not that negotiated between union and the multi-employer unit.

**34.** The parties disagree, for example, as to whether the agreement compels identical terms on all bargaining topics, whether labor is available outside the joint hiring hall, and whether the union has agreed to impose PMA/ILWU terms on all nonmember employers.

**35.** *Compare* Affidavits of Alex Parks, Counsel for Intervenor Ports, and Milton Mowat, Manager, Port of Portland, J.A. at 85–125 *with* Affidavits of Edmund Flynn, PMA President, and Fred Huntsinger, ILWU Negotiator, J.A. at 169–211, 216–18.

to cover problems so clearly within the realm of National Labor Relations Board expertise. The NLRB practice of certifying multi-employer bargaining units has been approved by the Supreme Court in general [36] and for the maritime industry in particular.[37] Similarly, there can be no question that the NLRB has more experience in interpreting contested bargaining terms than the FMC. At worst the case presents *Pennington* considerations. *See* text at notes 20–21 *supra.* These labor issues do not, of course, automatically assure NLRB exclusivity. A divided Supreme Court has ruled against primary jurisdiction in the NLRB for anticompetitive agreements. *See Connell Construction, supra,* 421 U.S. at 633–34, 95 S.Ct. 1830; *Jewel Tea, supra,* 381 U.S. at 685–88, 85 S.Ct. 1596. While the Court recognized the expertise of the NLRB on matters such as determining whether certain negotiating topics were mandatory, it believed that the ultimate question of whether antitrust policies overrode collective bargaining objectives was properly one *for the judicial process.* In noting the strong labor considerations involved in the case before us we are not advocating exclusive jurisdiction for the NLRB; rather we are removing from the FMC the "primary jurisdiction" inherent in the pre-approval system of the Shipping Act for labor agreements concerned with uniform fringe benefits and work stoppage policies. We agree with the Supreme Court that courts, and not labor or shipping agencies, are best suited to balancing the conflicting interests of the acts which these agencies must enforce. In the case *sub judice,* antitrust cases raising identical

claims are the proper forums for resolution of the issue. *See* note 11 *supra.*

In rejecting section 15 jurisdiction over these agreements, we do not insulate them from the antitrust laws or from FMC scrutiny. As the Court has frequently observed, "[T]here are limits to what a union or an employer may offer or extract in the name of wages, and because they must bargain does not mean that the agreement reached may disregard other laws." *Pennington, supra,* 381 U.S. at 665, 85 S.Ct. at 1591.

Despite the inappropriateness of section 15 procedures for collective bargaining agreements, shipping concerns are clearly evident in the possibility that the *actual implementation* of the agreement will result in discriminatory practices or rates against the complaining ports. The concept of section 15 jurisdictional prerequisites different from those of sections 16 and 17 is not novel. The Act itself provides for FMC consideration of individually-imposed discriminatory rates and practices as well as approval of inter-carrier agreements. Although the FMC must assure facial compliance with sections 16 and 17 before approving submitted agreements under its mandate to disapprove agreements "in violation of this chapter," it has continuing jurisdiction over approved agreements [38] to ensure that implementing practices do not violate the prohibitions against discriminatory rates and practices. 46 U.S.C. § 814 (1970). *See also Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 65, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970); Memorandum of Law of Hearing Counsel, Doc. No. 72–48 (FMC, Dec. 15, 1972), J.A. at 74.[39] Justice Doug-

---

36. Congress intended "that the Board should continue its established administrative practice of certifying multi-employer units, and intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future."

 *NLRB v. Truck Drivers Local 449,* 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957), *quoted in Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 283, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

37. 353 U.S. at 94, 77 S.Ct. 643.

38. "The Commission shall . . . disapprove, cancel or modify any agreement, . . . *whether or not previously approved by it,* . . . in violation of this chapter . . . ." 46 U.S.C. § 814 (1970) (emphasis added).

39. Should these various collective bargaining agreements be found lawful by the courts despite the *Pennington* case, we submit, and the parties carry out specific practices which may unduly prejudice the ports or cargo in violation of section 16, or may constitute unreasonable practices under section 17 of the Shipping Act, Shipping Act concern may

las, dissenting in *Volkswagenwerk*, recognized potential FMC jurisdiction under sections 16 and 17 for practices growing out of an agreement that might be exempt from filing under section 15. 390 U.S. at 314, 88 S.Ct. 929. Although Justice Harlan's separate concurrence rejects this suggestion, *id.* at 285–86, 88 S.Ct. 929, his opinion, and that of the majority, acknowledges the difference between "labor agreements" and "labor-related agreements" and that the difficult line-drawing involved in these cases depends upon the type of agreement involved.

FMC jurisdiction under sections 16 and 17 must still accommodate labor concerns and the exemption borrowed from antitrust law would appear to be the proper limit on that jurisdiction. Unlike the prior approval strictures of section 15, sections 16 and 17 impose penalties after-the-fact and do not interrupt industrial peace by forbidding or postponing implementation of collective bargaining terms. Like the antitrust laws, they protect the shipping industry from predatory rates and practices and are thus suitable tools for controlling Shipping Act violations which result from labor-management conspiracies.

Because the FMC order before us is a finding of jurisdiction under section 15 only, we need not determine at this time whether the *Boston II* four-prong test accurately reflects the labor/antitrust exemption carved out by the Supreme Court. We would caution the Commission, however, that parsing the Court decisions in this highly complex area may over-simplify the balancing process required and create a legal conundrum in which the total exemption is still greater than the sum of its parts.

In resolving the narrow issue before us, we have not ignored the antitrust/shipping overlap that our decision will create. Labor

become substantial and the obligations of members of the PMA under the Shipping Act (and also the ILWU as "any other person" under section 16) may have to be determined by the Commission.

J.A. at 74.

agreements not subject to section 15 approval may not obtain the benefit of the antitrust exemption provided in that section. *See generally Carnation Co. v. Pacific Westbound Conference, supra.* See also *Volkswagenwerk, supra,* 390 U.S. at 274 n.20, 88 S.Ct. 929, 936 ("Any agreement subject to § 15 filing that is not both filed and approved is not only illegal under § 15 but also subject to attack under the antitrust laws.") These agreements could thus be in violation both of sections 16 and 17 and of the antitrust laws, even though shipping considerations might outweigh the general applicability of Sherman Act principles. The *Cunard-Carnation* line of cases reveals a judicial willingness to defer to the expertise of the FMC within the limited antitrust exemption created. We are confident that, when the issue is presented squarely, the established principles of reconciling competing statutes will guide the courts in carrying out the objectives of both. Whether this is best accomplished through the doctrine of primary jurisdiction,[40] through creation of a non-statutory exemption for shipping as was done for labor,[41] or through allowing injured parties the choice of remedies [42] is not required by the posture of the case before us.

## IV. CONCLUSION

Like the holdings in the three lines of cases summarized above, this case must turn finally on a matter of line-drawing. We believe that the facts of this case clearly distinguish themselves from *Volkswagenwerk* and thus require a different result. Agreements between labor and management, while subject to antitrust and shipping legislation, cannot be fitted into the pre-implementation approval procedures of section 15 without ignoring the national policy fostering industrial peace through collective bargaining. We therefore reject

**40.** *See* text at notes 12–14.

**41.** *See* text at notes 15–23.

**42.** *See Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 224, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966).

the finding of FMC jurisdiction under section 15 and the case is hereby remanded to the Commission for further proceedings consistent with our opinion.

*So ordered.*