COUNCIL OF NORTH ATLANTIC SHIP-
PING ASSOCIATIONS and New York
Shipping Association, Inc., Petitioners,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents,

National Customs Brokers and Forward-
ers Association of America, Inc., et al.,
International Association of NVOCCs,
and American Importers Association,
Inc., Intervenors.

No. 78–1776.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 30, 1981.

Decided March 2, 1982.

Constantine P. Lambos, New York City, with whom Donato Caruso, New York City, and Francis A. Scanlan, Philadelphia, Pa., were on the brief, for petitioners.

Gordon M. Shaw, Atty., Federal Maritime Commission, Washington, D. C., with whom Sanford M. Litvack, Asst. Atty. Gen., Dept. of Justice, Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, and John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

Gerald H. Ullman, New York City, for intervenors, National Customs Brokers and Forwarders Association of America, Inc., et al.

Raymond P. deMember, Washington, D. C., was on the brief for intervenor, International Association of NVOCCs.

Samuel Frankel, New York City, was on the brief for intervenor, American Importers Association, Inc.

Before WRIGHT, MacKINNON and WALD, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Opinion concurring in part and dissenting in part filed by Circuit Judge MacKINNON.

J. SKELLY WRIGHT, Circuit Judge:

This case marks yet another chapter in the lengthy, difficult, and bitterly contested process of technological change in the maritime industry. The development of container technology—often described as the "container revolution"—created the potential for drastic reductions in the utilization of labor on the docks. For more than 20 years containerization has been one of the central issues in collective bargaining between the steamship and stevedoring companies, represented by the Council of North Atlantic Shipping Associations (CONASA)[1] and the New York Shipping Association (NYSA),[2] and the maritime workers, represented by the International Longshoremen's Association (ILA).[3]

After protracted negotiations punctuated by strikes and labor unrest, the employers and the ILA accepted a compromise, the Rules on Containers, which seek to preserve a portion of the longshoremen's traditional work jurisdiction while permitting containerization of a substantial proportion of cargo traffic. The National Labor Relations Board (NLRB) is currently evaluating the

---

1. CONASA is a multi-employer collective bargaining association whose constituent members are shipping employers' associations in the ports of Boston, Providence, Philadelphia, Baltimore, and Hampton Roads. Petitioners' brief at i; Joint Appendix (JA) 698a–699a.

2. NYSA is a multi-employer collective bargaining association of the shipping employers in the Port of Greater New York. NYSA participated in the underlying administrative proceedings before the Federal Maritime Commission (FMC) as a member of CONASA. In 1977 NYSA withdrew from CONASA; it has joined with CONASA in a joint petition for review. Petitioners' brief at ii.

3. The ILA is not a party to this case.

legality of these rules under the federal laws governing labor-management relations.[4] The Rules on Containers, however, also affect the interests of another group—the customers of the shipping lines—who are protected by the federal shipping laws from unjust, unreasonable, and discriminatory rates and practices.[5] In 1978 the Federal Maritime Commission (FMC) determined that the Rules on Containers violate the shipping laws.[6]

Petitioners CONASA and NYSA, associations of shipping employers, contend that the Rules are outside the jurisdiction of the FMC because collective bargaining agreements regarding work preservation are exempt from regulation under the shipping laws. We cannot agree. Under controlling principles adopted by the Supreme Court, the FMC has jurisdiction to determine the legality of the Rules on Containers. However, we remand to the FMC for reconsideration of its decision on the merits in light of intervening judicial decisions.

## I.  BACKGROUND

The development of container technology has had a momentous impact on the loading and unloading of ocean-borne cargo. New pressures, perils, and opportunities have faced longshoremen, steamship lines, steve-

doring companies,[7] shipping customers, freight forwarders, customs brokers, and other groups. Not only have changes in the quantity and types of work on the docks profoundly affected labor-management relations; the new technology has also given rise to new patterns of shipping traffic.

### A.  The History of Containerization

Before the advent of container shipment, boxes, crates, packages, and other cargo were generally transported to the docks in loose, "breakbulk" form. Longshoremen checked and sorted the cargo, placed it on pallets, and loaded each pallet into the hold of a ship. When the vessel arrived at its destination port, longshoremen unloaded the hold and sorted the individual shipments for pickup or storage.[8] Larger boxes, consolidating several packages or crates, were occasionally used in ocean freight but formed an insignificant proportion of cargo traffic.[9]

Beginning in the late 1950's in the trade between the Atlantic coast and the Gulf coast and between the Atlantic coast and Puerto Rico,[10] steamship lines began to use containers—large reusable metal receptacles ranging in length from 20 to 40 feet—which could be moved to and from a ship as

---

**4.** 29 U.S.C. §§ 158(b)(4)(B), 158(e) (1976) (§§ 8(b)(4)(B) and 8(e) of the National Labor Relations Act). *See NLRB v. Internat'l Longshoremen's Ass'n*, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980); *Internat'l Longshoremen's Ass'n*, Nos. 2–CC–1364 *et al.* (NLRB Initial Decision, Sept. 29, 1981) (decision by Administrative Law Judge (ALJ) on remand) (hereinafter cited as "NLRB Initial Decision"); discussion in Part II–A *infra*.

**5.** 46 U.S.C. §§ 812 Fourth, 815 First, 817(a), 845a (1976).

**6.** Report and Order Adopting Initial Decision, June 14, 1978, JA 103a–116a, 21 FMC 1 (1978).

**7.** Longshoremen and other maritime workers are employed either by steamship companies or by stevedoring companies and terminal operators who provide loading and unloading services under contract to steamship companies. *See* JA 626a–628a.

**8.** JA 144a–146a, 587a–589a, 710a–713a, 1327a–1330a, 1351a.

**9.** NLRB Initial Decision, *supra* note 4, at 17 n.21. Traditionally, consolidated boxes of household goods owned by persons changing places of residence, personal effects of military personnel, and United States mail were not handled by longshoremen at the piers. JA 714a–715a.

**10.** JA 499a, 596a–597a, 1097a, 1280a–1281a, 1284a–1285a. Containerization was introduced significantly later on other routes. Apparently in Baltimore and Hampton Roads it was initiated in 1965 and 1966 but did not have a substantial impact on work patterns until the late 1960's and early 1970's. *Internat'l Longshoremen's Ass'n v. NLRB*, 613 F.2d 890, 894 (D.C. Cir. 1979), *aff'd*, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980); NLRB Initial Decision, *supra* note 4, at 17 n.22. Even in the Port of New York, where container shipping was introduced during the late 1950's, it did not assume substantial proportions until the late 1960's. *See* note 23 *infra*.

a single unit.[11] These containers were sometimes loaded ("stuffed") with break-bulk cargo and unloaded ("stripped") at the pier by longshoremen.[12] But containers could also be transported by truck or rail to inland terminals for stuffing, thereby reducing dockside congestion, labor costs, and paper work.[13] Steamship companies began to supply empty containers to shippers for off-pier loading and to charge a lower rate for a fully-loaded container than for an equivalent amount of breakbulk cargo.[14]

Large-scale manufacturers and distributors could directly take advantage of the lower rates for containers by filling containers entirely with their own goods, either at their own facilities or at public warehouses. These containers were known in the trade as "full shippers' loads" or, if stuffed at a manufacturer's own facility by its own employees, as "manufacturer's label." In the early 1960's entrepreneurs began to offer some of the benefits of container shipping to small shippers whose cargo volume was not great enough to fill an entire container. Consolidators, also described as "non-vessel operating common carriers" (NVOCC's or NVO's),[15] combined the goods of various shippers into a single container obtained from a steamship company and then delivered the container to the pier. The shipment, under a single bill of lading in the consolidator's name, was eligible for the reduced container rate. The consolidator could charge his shipping customers slightly less than the steamship package rate, thus attracting business while making a profit.[16] NVO's offered shorter delivery times,[17] a single bill of lading, reduced export packaging expenses, better tracing, reduced risks of loss, damage, and pilferage at dockside,[18] and specialized services not provided by the steamship lines.[19] Many NVO's experienced dramatic growth in traffic volume and revenues during the 1960's.[20]

The increasing use of containers on conventional ships and on specially fitted container ships greatly reduced the role of longshoremen in handling cargo. A full container, capable of carrying 30,000 pounds of freight, can be transported by truck or rail directly to and from the pier and can be hoisted on and off the vessel by crane, without any tallying, sorting, palletization,

11. A container ship can be loaded or unloaded in a fraction of the time required for a conventional ship. As a result the in-port time of each ship is reduced and a given volume of cargo can be carried in a smaller number of ships. *NLRB v. Internat'l Longshoremen's Ass'n, supra* note 4, 447 U.S. at 495, 100 S.Ct. at 2309.

12. JA 1282a, 1287a–1290a, 1348a.

13. JA 121a–122a, 232a, 283a–284a, 530a–531a, 1023a–1024a, 1085a, 1154a–1155a, 1158a, 1163a–1164a, 1295a–1297a.

14. Freight rates for "less than containerload" (LCL) shipments vary from commodity to commodity. A uniform "freight-all-kinds" (FAK) rate is charged for containerloads consolidated away from the pier. The FAK rate is considerably lower than the LCL rate for any commodity. JA 1029a, 1257a–1260a; *cf.* JA 195a.

   Several witnesses testified before the FMC that some steamship lines welcomed and even actively encouraged the development of non-vessel operating (NVO) carriers to handle LCL traffic. JA 256a–260a, 263a–264a, 1031a–1032a, 1163a–1165a, 1413a.

15. Typically a consolidating company owns no trucks or terminal facilities and employs no truck drivers; it leases services and facilities from other firms. Its small workforce is primarily managerial and clerical. JA 260a–261a, 271a–272a, 1217a; NLRB Initial Decision, *supra* note 4, at 38.

16. JA 1029a, 1035a–1037a, 1360a–1361a, 1410a–1411a.

17. NVO's could offer quicker delivery than a steamship company by choosing the earliest sailing from the schedules of several carriers, JA 1022a, 1292a, and by planning loads for direct delivery at the destination, JA 1293a.

18. JA 482a–486a, 1030a, 1037a, 1144a, 1292a–1294a.

19. NVO's offered various special services not offered by the steamship lines, including prepaid, collect, or C.O.D. shipments, paid pickup service, storage in transit, advance of inland freight charges, and consolidation or deconsolidation of various shipments belonging to a single customer but arriving from different sources or consigned to various destinations. JA 1022a–1023a, 1030a, 1293a–1294a, 1477a.

20. JA 260a, 1021a, 1209a, 1298a–1299a.

loading, or unloading of individual packages by longshoremen.[21] Productivity per man-hour has increased markedly[22]; as a result the need for labor on the piers has drastically declined. In the Port of Greater New York in 1968, immediately before the onset of large-scale containerization,[23] 23,500 registered longshoremen worked nearly 400 million man-hours. By 1975 fewer than 14,000 registered longshoremen worked less than 25 million man-hours.[24]

From the outset the International Longshoremen's Association strongly resisted the loss of jobs and members resulting from adoption of containerization. In every set of collective bargaining negotiations from 1957 to the present, including sessions in 1959, 1962, 1964, 1968, 1971, and 1974, containerization was the overriding issue.[25] The ILA consistently sought to preserve its traditional work jurisdiction and to share in the economic benefits of labor-saving technology; the steamship companies with equal persistence sought maximum flexibility to use containers and increase productivity.[26] Under the pressure of actual and threatened work stoppages,[27] the two sides reached a succession of unstable agreements that partially restricted the use of containers. In the 1959, 1962, and 1964 agreements ambiguous wording allowed "unrestricted" movement of containers but also recognized the ILA's jurisdiction over stuffing and stripping within the general port area; the ILA received a royalty payment for each container.[28] Although the steamship companies continued to move some consolidated containers across the piers without ILA handling, the ILA asserted the right to stuff or strip such containers at the pier.[29]

A bitter and lengthy strike in 1968, lasting for 57 days in the Port of New York and more than 100 days on the Gulf coast,

---

21. JA 766a–777a.

22. JA 715a (in Port of New York productivity averaged .3 ton per man-hour in 1958, .8 ton per man-hour in 1974); NLRB Initial Decision, *supra* note 4, at 21–22 n.7 (productivity is .5 ton per man-hour on a breakbulk vessel and 2.54 tons per man-hour on a fully automated container ship).

23. Until 1968, several witnesses testified, container traffic was a relatively small part of the cargo in the Port of New York. JA 498a–499a, 563a, 619a. In 1966 containers accounted for 3% of general cargo, *NLRB v. Internat'l Longshoremen's Ass'n, supra* note 4, 447 U.S. at 497, 100 S.Ct. at 2310, and approximately 20% of all cargo, NLRB Initial Decision, *supra* note 4, at 19. Most of the containers were used in the Puerto Rican trade, but in 1967 Sea-Land Service, Inc. introduced the first fully containerized vessel in the North Atlantic trade. Other steamship companies followed suit. *Id.* By 1974, 70% of the cargo tonnage passing through the Port of New York was containerized. *Id.* at 23–24.

24. JA 619a, 751a, 1501a–1503a. Over a longer period the decline in the number of registered longshoremen in the Port of New York is in large measure attributable to the Waterfront Commission's program of "decasualization"— deregistration of surplus labor. JA 496a–499a. Registration dropped from approximately 41,000 in 1954 to approximately 23,500 in 1968. JA 751a. The president of CONASA testified that decasualization had been accomplished prior to 1968. JA 619a.

25. *See generally* JA 718a–730a. From 1956 until the formation of CONASA in 1970, North Atlantic ports generally adopted the master terms of the labor agreement for the Port of New York. JA 700a–701a; NLRB Initial Decision, *supra* note 4, at 17 n.23. After its establishment CONASA negotiated terms and conditions on wages, hours, welfare benefits, containerization, and several other major issues, leaving local terms and conditions for resolution in individual ports. JA 700a–701a.

26. JA 555a–557a, 576a, 596a, 718a–719a, 723a–728a, 1506a–1508a.

27. Strikes occurred in 1962, 1964, 1968, and 1971; in addition, the ILA on several other occasions refused to handle certain categories of containers. *See generally* JA 720a–738a, 532a–533a.

28. 1959 agreement, § 8, JA 752a–1; Containerization Arbitration Award, November 21, 1960, JA 753a–783a (establishing rates of royalty payments); discussion of 1962 agreement, JA 722a–723a; 1964 general cargo agreement, Part XII, JA 918a–919a. A system of guaranteed annual income for ILA longshoremen was agreed upon in the aftermath of the 1964 strike and instituted in 1966. JA 501a.

29. JA 720a–726a, 788a–840a, 924a–935a, 1355a–1356a.

resulted in presidential mediation[30] and eventually in a more detailed and comprehensive agreement on the utilization of containers. The basic requirements of the present-day Rules were adopted in 1969,[31] but the union continued to complain about lax enforcement and unchecked container movement in violation of the collectively-bargained Rules.[32] Faced by the ILA's threat to abrogate the compromise, the employers agreed in the early 1970's to more rigid provisions to enforce the Rules,[33] culminating in 1973 in the "Dublin Supplement." [34]

### B. *The Rules on Containers*

The Rules on Containers represent "a reasoned response to the difficult problem of technological innovation," as this court has recognized in the labor-management context.[35] Qualified by detailed definitions, exceptions, and enforcement provisions, the Rules [36] generally require that containers

owned, leased, or used by steamship companies, if they originate within or are destined to a point within 50 miles of the center of any ILA port, must be stuffed and stripped by ILA deepsea labor on the pier, not by other employees at inland terminals. According to rough estimates by CONASA officials, the Rules permit 80 percent of container traffic to pass across the pier without rehandling by ILA labor; the remaining 20 percent remains within the work jurisdiction of the longshoremen's union.[37]

Within the 50-mile radius [38] the Rules require that all shipments, with three major exceptions, be stuffed and stripped at the pier rather than at inland terminals.[39] First, containers whose contents are owned by a single beneficial owner, including a manufacturer, and which are loaded or unloaded at the shipper's own facility by its own employees, need not be handled at the pier.[40] Second, import containers need not

---

**30.** JA 726a–730a, 843a–848a.

**31.** JA 849a–855a. *See* Part I–B *infra* (discussion of Rules).

**32.** JA 731a–738a, 856a–871a, 890a–895a.

**33.** JA 731a–738a, 856a–871a. Rule 3(h) of the Rules then in effect permitted the ILA to terminate the Rules if they failed to serve the purpose of protecting longshoremen's work jurisdiction. JA 854a (1968 agreement); JA 877a (1971 agreement).

**34.** JA 900a–905a. In April 1975 the ILA unilaterally suspended the Rules and began to strip all containers from within 50 miles of ILA ports, with the exception of those loaded by manufacturers at their own facilities. JA 398a, 532a–533a. Later the parties resolved their differences and reinstituted the Rules with modifications imposing further restrictions on containers. *See* JA 1529a–1532a (Rules on Containers "as clarified and reinstated by Supplemental Agreement of May 30, 1975").

**35.** *Internat'l Longshoremen's Ass'n v. NLRB*, *supra* note 10, 613 F.2d at 914 (review of NLRB proceeding regarding Rules).

**36.** Part I–B of this opinion discusses the post-1975 version of the Rules on Containers, JA 1529a–1532a. After the Dublin Supplement and the 1975 Supplemental Agreement, the terms of the Rules remained basically unchanged. For a detailed discussion of the evolution of the Rules up to 1975, *see Internat'l*

*Longshoremen's Ass'n v. NLRB*, *supra* note 10, 613 F.2d at 894–898; NLRB Initial Decision, *supra* note 4, at 19–23.

**37.** JA 621a, 654a–655a.

**38.** Some testimony in the record indicates that no point on the Atlantic or Gulf coasts is beyond the 50-mile radius of an ILA port. JA 634a–635a.

**39.** The Rules do not apply to export containers, whether consolidated or full shipper's loads, that originate beyond the 50-mile port area, or to import containers destined to consignees beyond the 50-mile zone. Rules 2–A–(1), 2–B–(1), JA 1530a.

**40.** Rules 2–A–(2)–(3), 2–B–(2), JA 1530a. Even if a load is owned by a single shipper or consignee, however, it may not be loaded or unloaded within the 50-mile zone by persons other than the owner's employees or at any place other than the owner's facility. The Rules are violated if a full shipper's load is handled by the employees of a public warehouse or a motor carrier line, even for the motor carrier's own convenience. *See Internat'l Longshoremen's Ass'n v. NLRB*, *supra* note 10, 613 F.2d at 895; NLRB Initial Decision, *supra* note 4, at 43–47.

be stripped at the pier if they are actually stored at regular rates at a bona fide public warehouse for 30 days prior to distribution.[41] Third, containers of mail, household goods of persons changing residences, and personal effects of military personnel are exempt from stripping and stuffing regardless of their place of origin or destination.[42] "The main remaining containerloads which the ILA now insists on stuffing and stripping at the piers," the FMC's Administrative Law Judge (ALJ) has written, "are containers coming to and from NVOCCs, consolidators, forwarders, deconsolidators, and other shippers and consignees who do not use their own employees to load and unload their containers, where the containers come to or go from points within 50 miles of a port." [43]

Over the course of more than a decade of negotiations, stiff enforcement provisions have been added to the Rules. Shippers must provide detailed documentation to enable the shipping line to determine whether the container is subject to stuffing or stripping at the pier.[44] In addition, the shipping companies must not provide containers to consolidators, distributors, or any other persons operating in violation of the Rules.[45] If a consolidated container arrives at the pier, it must be stripped and restuffed into a different container before it may be loaded aboard ship.[46] If the violation is discov-

ered after the container has been loaded, the steamship company must pay $1,000 in liquidated damages per container into the royalty fund.[47] A joint labor-management committee interprets the Rules and determines infractions with the assistance of a team of container investigators.[48]

The Rules on Containers impose burdens on importers, exporters, consolidators, distributors, and others within the 50-mile zone. If containers could move freely across the pier without ILA handling, regardless of the identity of the shipper, the place of origin, or the destination, then small shippers within the 50-mile zone could take full advantage of the benefits of container shipping. In contrast, the stuffing and stripping requirements allegedly increase shipping delays and labor costs, augment the risk of loss, pilferage, and damage in transit due to improper stowage, and deprive the shippers of the special services provided by consolidators.[49] NVO's and distributors previously operating within the 50-mile zone have been severely affected and in some cases have been forced to cease operations.[50]

On the other hand, the 50-mile rule and the enforcement provisions of the Dublin Supplement have averted further reductions of employment opportunities for ILA

41. Rule 2–B–(4), JA 1530a.

42. Rules 2–A–(4), 2–B–(3), JA 1530a.

43. JA 51a.

44. Rule 9(b), JA 1531a; JA 1397a–1398a (specific documentation requirements).

45. Rule 1(e), JA 1529a (1975 amended agreement); Interpretation 1.6–2, JA 904a (Dublin Supplement).

46. Rule 1(c), JA 1529a (1975 amended agreement); Interpretation 1.6–1(a), JA 904a (Dublin Supplement). This provision seeks to deter off-pier stuffing rather than to require duplicate handling.

47. Rule 7(c), JA 1531a.

48. Rule 9(a), JA 1531a; JA 206a–209a, 341a–348a, 392a–396a, 704a–705a, 938a–1016a (records of complaints, investigations, audits, and penalties).

49. JA 250a–251a, 315a–318a, 435a–438a, 486a, 1119a, 1124a, 1142a–1143a, 1263a, 1419a, 1431a–1432a, 1445a–1448a, 1480a. *See* note 19 *supra* (special services provided by consolidators). *But see* JA 412a–415a, 545a–549a, 649a–650a (testimony that risk of pilferage is not greater at dockside than elsewhere).

Several shippers and consolidators testified that, because NVO's have the incentive and expertise to stuff the maximum amount into each container without damage, in contrast with longshoremen, restuffing at the pier may result in improperly loaded cargo or in overflow cargo which is not placed in the same container. JA 430a, 438a–440a, 471a, 1406a–1407a.

50. JA 434a, 436a, 466a–467a, 1045a–1047a, 1143a–1144a, 1419a, 1520a; *cf.* JA 1459a–1464a (wholesale exporter).

longshoremen [51] and have reduced labor-management strife on the waterfront. Petitioners warn that if the Rules are set aside, the longshoremen may renew their demand for stripping and stuffing of all containers, not only those subject to the 50-mile rule. "Economic warfare would be the inevitable result," petitioners contend.[52]

## C. *Federal Maritime Commission Proceedings*

This case involves the provisions of the Rules on Containers as incorporated by the Puerto Rico Maritime Steamship Authority (PRMSA) into its ocean tariff—the contract of shipment it offers to shipping customers.[53] PRMSA, a quasi-governmental instrumentality of the Commonwealth of Puerto Rico, was created in 1974 to take over the steamship operations of several privately owned lines operating between Puerto Rico and the eastern United States.[54] Two of these lines—Sea-Land Service, Inc. and Gulf Puerto Rico Lines, Inc.—had included the Rules in their filed tariffs, along with additional provisions passing the liquidated damages and extra

handling costs on to shippers in some instances. The FMC had begun an investigation of the legality of these provisions.[55] After the establishment of PRMSA the FMC initiated an investigation of the PRMSA tariff and consolidated the two proceedings.[56] The orders of investigation alleged possible violations of several sections of the federal shipping laws imposing obligations on common carriers: Section 14 Fourth of the Shipping Act of 1916, which prohibits unfair treatment of or unjust discrimination against any shipper with regard to cargo space accommodations [57]; Section 16 First of the Shipping Act of 1916, which makes it illegal to subject any person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage [58]; and Section 18(a) of the Shipping Act of 1916 and Section 4 of the Intercoastal Shipping Act of 1933, both of which require tariffs, rules, and regulations to be just and reasonable.[59]

On October 9, 1975 the Administrative Law Judge (ALJ) issued an Initial Decision.[60] He rejected CONASA's contention that the FMC lacked jurisdiction over the Rules on Containers because of their origin

---

**51.** CONASA estimated in 1974 that the work of loading and unloading consolidated containers generated jobs for approximately 3,000 employees in the Port of Greater New York alone. JA 741a.

**52.** Petitioners' reply brief at 15–16.

**53.** JA 1380a–1396a.

**54.** Petitioners' brief at 8 n.11.

**55.** Order of Investigation and Suspension, Docket No. 73–17, April 13, 1973, JA 1a–7a.

**56.** Order of Investigation and Suspension, Docket No. 74–40, September 13, 1974, JA 21a–26a. The FMC lifted its suspension of the tariffs at issue on September 23, 1974, JA 27a–28a, because it found that continued suspension of the Rules on Containers would "not be in the public interest." The tariffs therefore became effective, except that their application to two consolidation companies was barred by federal court injunction under the National Labor Relations Act pending final NLRB decision. *Balicer v. Internat'l Longshoremen's Ass'n*, 364 F.Supp. 205 (D. N.J.), aff'd mem., 491 F.2d 748, 750 (3d Cir. 1973) (Consolidated Express); *Balicer v. Internat'l Longshoremen's Ass'n*, 73 Civ. 1811 (D. N.J. April 19, 1974) (Twin Express).

The NLRB subsequently held the Rules to be illegal. *Internat'l Longshoremen's Ass'n*, 221 NLRB 956 (1975), aff'd, 537 F.2d 706 (2d Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977). *But see* discussion in Part II–A *infra* (rejection of NLRB position in Supreme Court review of another proceeding). With respect to all other companies, the Rules on Containers appear to have been in effect between 1974 and 1981. On February 24, 1981, however, a federal district court issued an injunction restraining enforcement of the Rules in all Atlantic and Gulf coast ports pending resolution of the NLRB proceeding on remand from the Supreme Court. *Pascarell v. New York Shipping Ass'n*, No. 81–13 (D. N.J.), aff'd, 650 F.2d 19 (3d Cir. 1981), *cert. denied*, — U.S. —, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981). The Court of Appeals, relying on the *Balicer* cases, erroneously assumed that the Rules were "never operative" from 1973 to 1981.

**57.** 46 U.S.C. § 812 Fourth (1976).

**58.** *Id.* § 815 First.

**59.** *Id.* §§ 817(a), 845a.

**60.** JA 32a–81a.

in a collective bargaining agreement.[61] He also ruled that the tariff provisions violated the common carrier obligations imposed on PRMSA by the shipping laws. Under the Rules, he noted, an export shipper within the 50-mile zone who loads a full container at his own facility obtains more favorable treatment than either a shipper whose full container is loaded at a public warehouse or a shipper whose goods form part of a consolidated container load. Imported containers whose destinations are within the 50-mile zone are subject to ILA stripping or 30 days' warehouse storage only if the owner does not unload the goods at his own warehouse facilities. None of these differences, the ALJ found, are justified by differences in the transportation services provided by the steamship company, which in each case simply transports a sealed container aboard its vessel.[62] Apart from the discrimination among categories of shippers, the ALJ concluded that the additional delay, expense, and fines imposed upon shippers by the Rules, and the ambiguity of some of the provisions, made the Rules unjust and unreasonable to shippers.[63]

Upon review the Federal Maritime Commission adopted the findings and Initial Decision of the ALJ.[64] Conceding that the existence of a collective bargaining agreement was a factor worthy of consideration, the Commission concluded that it did not outweigh other transportation factors and failed to justify the disparity in treatment among shippers.[65] The decision was issued on June 14, 1978. CONASA and NYSA filed a timely joint petition for review of both the jurisdictional and the substantive determinations of the Commission.[66]

## II. THE JURISDICTIONAL ISSUE

Petitioners CONASA and NYSA have addressed their briefs solely to the jurisdictional question, asserting that they have held their substantive challenge "in reserve," to be "only reached after the question of exemption has been resolved."[67] They contend that the FMC completely lacks jurisdiction over the PRMSA tariff provisions in question because they are work preservation rules derived directly from a collective bargaining agreement. In their view, the Rules are "governed by the specific provisions of federal labor law"[68] and should therefore be beyond the reach of any other regulatory scheme. The FMC, petitioners maintain, is simply "unequipped to deal with the sensitive and delicate collective bargaining process"[69]; it has "tor[n] asunder the accomplishments of more than fifteen (15) years of difficult and strike marked collective bargaining over the thorny issue of technological job displacement * * *."[70]

CONASA and NYSA advance two grounds for recognizing a "labor exemption" from the federal shipping laws—the Maritime Labor Agreements Act of 1980 and the nonstatutory labor exemption doctrine. Neither ground provides a persuasive basis for denying the FMC's jurisdiction to determine whether tariff provisions incorporating the Rules on Containers violate the common carrier requirements of the shipping laws.

61. JA 70a–78a.

62. JA 67a–68a.

63. JA 69a

64. JA 103a–116a.

65. JA 109a–111a.

66. Joint Petition for Review, D.C.Cir. No. 78–1776, filed August 9, 1978. This court held the case in abeyance pending adjudication by the United States Court of Appeals for the District of Columbia Circuit and by the Supreme Court in NLRB proceedings regarding the legality of the Rules on Containers. *See* discussion in Part II–A *infra.*

67. Petitioners' brief at 7–8 n.10. Therefore, the merits of the FMC's decision are not before us upon review. Nevertheless, we are remanding the case *sua sponte* to the FMC for reconsideration in light of legal developments which occurred after the FMC's 1978 decision.

68. Petitioners' brief at 2.

69. Petitioners' reply brief at 14.

70. *Id.* at 14 n.14.

### A. The National Labor Relations Act and the Rules on Containers

█ Petitioners emphasize that the National Labor Relations Board has jurisdiction over the Rules on Containers. They contend that the specific provisions of Sections 8(b)(4)(B) and 8(e) of the National Labor Relations Act [71] "provide the sole and exclusive test for adjudicating the validity of work preservation agreements." [72] According to their brief, "Congress expressed its preference for the NLRB, as 'the forum of choice,' in determining whether a labor agreement represented a legitimate work preservation program or an unlawful 'hot cargo' or other secondary boycott scheme." [73] We must therefore begin by examining the nature of the NLRB's jurisdiction.

Section 8(b)(4)(B) of the National Labor Relations Act prohibits unions and their agents from engaging in "secondary" activities whose object is to force one employer to cease doing business with another. Section 8(e) outlaws those collective bargaining agreements in which the employer agrees to cease doing business with any other person. Neither section encompasses legitimate work preservation agreements with "the purpose of preserving for the contracting employees themselves work traditionally done by them." [74]

In unfair labor practice proceedings initiated by trucking companies and consolidators, the NLRB concluded that the Rules on Containers violated Section 8(e) and that union action to enforce them violated Section 8(b)(4)(B). [75] Defining the work in controversy as off-pier stuffing and stripping of containers—which had not traditionally been performed by longshoremen—the Board held that the Rules on Containers "did not have a lawful work-preservation object." [76] In an enforcement proceeding this court held that the Board had erroneously defined the "work in controversy" because it had ignored traditional work patterns. [77] The Supreme Court affirmed this court's decision, agreeing that the Board's approach to defining the work at issue was incorrect as a matter of law. The Court remanded to the Board for careful analysis of the relationship between traditional longshore work and the work assigned to ILA members by the Rules on Containers. It expressly stated that the FMC proceedings regarding the Rules "present difficult and complex problems which are not properly before us." [78] On remand the Board's Administrative Law Judge issued an Initial Decision upholding the Rules in large part but invalidating them in some particulars. [79] The comprehensive opinion offers a detailed analysis of the traditional patterns of freight movement and the job functions performed by longshoremen, motor carrier drivers, public warehousemen, consolidators, and others.

Even a brief discussion of the labor law proceedings demonstrates that NLRB examination of the Rules on Containers differs substantially from FMC scrutiny under the federal shipping laws. This difference reflects the two functions played by the collective bargaining provisions. The Rules govern the relationship between labor and management; incorporated into tariff pro-

71. 29 U.S.C. §§ 158(b)(4)(B), 158(e) (1976).

72. Petitioners' brief at 26b.

73. *Id.* at 49.

74. *NLRB v. Enterprise Ass'n of Steam, etc. Pipefitters, Local No. 638,* 429 U.S. 507, 517, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977), *quoted in NLRB v. Internat'l Longshoremen's Ass'n, supra* note 4, 447 U.S. at 504, 100 S.Ct. at 2313.

75. *Internat'l Longshoremen's Ass'n, supra* note 56, 221 NLRB 956; *Internat'l Longshoremen's Ass'n,* 231 NLRB 351 (1977) and 236 NLRB 525 (1978), *rev'd,* 613 F.2d 890 (D.C.Cir.1979), *aff'd,*

447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980).

76. *Internat'l Longshoremen's Ass'n, supra* note 75, 236 NLRB at 526.

77. *Internat'l Longshoremen's Ass'n v. NLRB, supra* note 10, 613 F.2d at 908–910.

78. *NLRB v. Internat'l Longshoremen's Ass'n, supra* note 4, 447 U.S. at 509–512, 100 S.Ct. at 2316–2318.

79. NLRB Initial Decision, *supra* note 4.

visions filed by steamship companies, they also govern the relationship between shipping customers and steamship operators. The ALJ at the NLRB noted that the NLRB and the FMC are responsible for "effectuating different Congressional policy pursuant to different legislative standards."[80] The NLRB's interpretation of Sections 8(b)(4) and 8(e) does not answer the questions the FMC is required to ask—do the Rules unduly discriminate against certain shippers, and are they unjust and unreasonable?[81]

### B. The Maritime Labor Agreements Act of 1980

Even if the issues considered by the NLRB and the FMC do not coincide, Congress has the power to exclude work preservation agreements from the jurisdiction of the latter agency. Petitioners contend that Congress exercised that power by enacting the Maritime Labor Agreements Act of 1980. We find that the language and legislative history of the statute fail to bear out petitioners' contention; the Act did not deprive the FMC of jurisdiction over this case.

The Maritime Labor Agreements Act of 1980 was the product of a legislative attempt to clarify jurisdictional boundaries in the area where labor law and shipping law intersect—the provisions of maritime collective bargaining agreements. Historically the FMC had taken the position that none of these agreements were subject to the provisions of Section 15 of the Shipping Act, which requires that a wide range of maritime agreements be filed with and approved by the Commission before they may enter into effect.[82] However, beginning in 1968,[83] judicial decisions had held that Section 15 covered certain collective bargaining agreements and multi-employer agreements to implement promises made in collective bargaining.[84] In 1980 the House, citing the national policy of "free collective bargaining without a requirement of prior government approval,"[85] adopted a bill which completely exempted collective bargaining agreements from FMC regulations.[86] The House bill removed FMC jurisdiction to review maritime labor agreements, before or after implementation, or to determine their legality under the substantive provisions of the shipping laws.[87] This blanket labor exemption aroused strong opposition.

At hearings held by the Senate committee, shippers, consolidators, and other witnesses objected that the bill "stripped the FMC of jurisdiction to assure equal treatment of shippers, cargo, and localities and to prevent abuses made possible by one concerted activity of carriers and others."[88]

**80.** *Id.* at 73. Although the legislative standards are different, some of the policy factors germane to the NLRB's decision should also be taken into account by the FMC in its shipping-law determination. *See* Part III *infra*.

**81.** If the Rules are ultimately invalidated under the National Labor Relations Act, the FMC's proceedings will of course be moot.

**82.** 46 U.S.C. § 814 (1976); *see* S.Rep. No. 96–854, 96th Cong., 2d Sess. 1, 7 (1980), U.S.Code Cong. & Admin.News 1980, p. 2447; H.R.Rep. No. 96–876, 96th Cong., 2d Sess. 2 (1980). The question of the applicability of the substantive provisions of the shipping laws to collective bargaining agreements apparently did not arise.

**83.** *Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); *see* note 105 *infra*.

**84.** *Id.; FMC v. Pacific Maritime Ass'n*, 435 U.S. 40, 98 S.Ct. 927, 55 L.Ed.2d 96 (1978); *New York Shipping Ass'n v. FMC*, 495 F.2d 1215 (2d Cir.), *cert. denied*, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974).

**85.** H.R. Rep. No. 96–876, *supra* note 82, at 5.

**86.** *Id.* at 10–12.

**87.** *Id.* at 11. Despite the blanket exemption from FMC jurisdiction, the House report stated, "This amendment does not preclude any common carrier utilizing rates, fares, or charges which unjustly discriminate between shippers or ports, or are unjustly prejudicial to U.S. exporters, from being subject to complaints before the Commission." *Id.* at 8. The House committee seems to have assumed an implicit proviso to the exemption similar to the one expressly included in the Senate's amendment.

**88.** *See* S. Rep. No. 96–854, *supra* note 82, at 10; *Hearing Before the Subcommittee on Merchant Marine and Tourism of the Senate Committee on Commerce, Science, and Transportation on H.R. 6613*, 96th Cong., 2d Sess. (1980).

In response, the Senate committee drafted a revised bill to assure "that Federal Maritime Commission jurisdiction is preserved to the extent necessary" to assure equal treatment and to prevent abuses.[89] The bill was adopted by the Senate without debate,[90] and passed by the House, again without debate.[91]

Section 5 of the Act exempts maritime labor agreements from regulation under all provisions of the Shipping Act of 1916 and the Intercoastal Shipping Act of 1933, with the proviso that there would be no exemption

> for any rates, charges, regulations, or practices of a common carrier by water or other person subject to this chapter which are required to be set forth in a tariff, whether or not such rates, charges, regulations, or practices arise out of, or are otherwise related to[,] a maritime labor agreement.[92]

This proviso appears to retain existing FMC jurisdiction over the Rules on Containers as applied to shipping customers through steamship company tariffs.[93] Explicitly aware of the clash of interests created by the Rules,[94] Congress sought to retain FMC jurisdiction to scrutinize the Rules' adverse effects upon shippers.[95] Moreover, under well established shipping law doctrine, all terms and conditions relating to a carrier's acceptance and carriage of cargo must be set forth in its tariffs.[96] In 1969 the FMC decided that tariff provisions derived from the Rules on Containers were required to be set forth in a carrier's tariff,[97] and in 1977 a federal district court adopted a similar interpretation of the tariff filing provisions.[98]

We need not decide the scope of the proviso to Section 5, however, because another provision of the 1980 statute unequivocally preserves existing FMC jurisdiction over the present proceedings. Section 6 states that the changes made by the Act "shall not affect * * * formal Commission proceedings commenced prior to the date of

**89.** *See* S. Rep. No. 96–854, *supra* note 82, at 10. This assurance was repeated several times in the Senate report. *Id.* at 1–2 (statement of purpose), 2 (background and need), 13 (regulatory impact), 14 (section-by-section analysis).

**90.** 126 Cong.Rec. S9778 (daily ed. July 24, 1980).

**91.** *Id.* at H6791–H6792 (daily ed. July 30, 1980).

**92.** 46 U.S.C.A. § 841c (1981 Pocket Part); *see* S.Rep. No. 96–854, *supra* note 82, at 19.

**93.** Petitioners seek to avoid the § 5 proviso by arguing that the challenged tariff provisions are in the exact words of the collective bargaining agreements and therefore do not "arise out of" and are not "otherwise related to" a maritime labor agreement. Petitioners' brief at 30–31. This argument is not persuasive, because the proviso extends to all matters "which are required to be set forth in a tariff"; the relationship of these provisions to maritime labor agreements is not controlling. 46 U.S.C.A. § 841c (1981 Pocket Part).

**94.** *See* S.Rep. No. 96–854, *supra* note 82, at 6, 8–9; H.R.Rep. No. 96–876, *supra* note 82, at 4.

**95.** S.Rep. No. 96–854, *supra* note 82, at 13 ("the bill retains the existing protections of the Shipping Act for shippers, carriers and localities which may be adversely affected by shipping practices which may arise out of maritime labor agreements").

**96.** 46 U.S.C. § 817(b)(1) (1976) (tariffs in foreign commerce shall show "the classification of freight in force," shall state "any rules or regulations which in anywise change, affect, or determine any part or the aggregate of * * * rates, or charges," and shall include "specimens of any bill of lading, contract of affreightment, or other document evidencing the transportation agreement"); *id.* § 817(a) (carriers in interstate commerce shall file rates, fares, and charges with FMC); *id.* § 844 (tariffs in intercoastal commerce subject to requirements similar to tariffs in foreign commerce). *See Order That A. H. Bull Steamship Co. Show Cause*, 7 FMC 133, 136 (1962).

**97.** *South Atlantic & Caribbean Lines, Inc.*, 12 FMC 237, 238–242 (1969).

**98.** *United States v. Sea-Land Service, Inc.*, 424 F.Supp. 1008, 1011, 1012 (D. N.J. 1977), *appeal dismissed mem.*, 577 F.2d 730 (3d Cir. 1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979). The FMC has recently instituted proceedings against steamship carriers which adhere to the Rules without incorporating the provisions into their tariffs. NLRB Initial Decision, *supra* note 4, at 66–67 (referring to order of investigation dated February 3, 1981, Docket No. 81–11).

enactment of this Act." [99] Moreover, the Senate committee expressly referred to these consolidated FMC proceedings, noting that they were pending on appeal before this court.[100] The 1980 legislation in its ultimate form thus has no bearing on the FMC's jurisdiction over the Rules on Containers in Dockets Nos. 73–17 and 74–40. We must turn to the nonstatutory law which defined FMC jurisdiction over the products of collective bargaining agreements prior to 1980.

### C. The Nonstatutory Labor Exemption

Although the federal shipping laws, prior to 1980, did not expressly create any statutory exemption for collective bargaining agreements, the FMC and the courts recognized a partial nonstatutory exemption in an effort to accommodate the overlapping regulatory schemes of shipping, labor, and antitrust law. If an agreement is exempt, the FMC does not exercise jurisdiction to determine whether it violates the law, but even if an agreement is not exempt it nevertheless might be lawful under the Shipping Act of 1916 and the Intercoastal Shipping Act of 1933.[101]

No judicial precedents address the precise issues raised in this case: whether any labor-management agreements are exempt from the substantive provisions of the shipping laws, and, if so, whether enforcement of the collectively-bargained Rules on Con-

tainers qualifies for exemption. Prior cases delineating the nonstatutory labor exemption from the shipping laws have dealt with the pre-implementation filing and approval requirements of Section 15 of the Shipping Act of 1916, not with the prohibitions against unreasonably discriminatory and unjust rates and practices in Sections 14, 16, and 18.[102] We need not decide whether this nonstatutory exemption applies to the substantive provisions of the shipping laws, because the Rules on Containers would not qualify for such an exemption under the definition adopted by the Supreme Court. In 1978 the Court decided, in *FMC v. Pacific Maritime Ass'n*, that an agreement is not exempt if it directly imposes terms on persons or entities outside the agreement.[103] The Commission contends that this restrictive principle applies to tariffs filed by carriers as well as to collective bargaining agreements. *See* note 125 *infra*. We conclude that, because enforcement of the Rules on Containers by inclusion in steamship company tariffs imposes terms on third parties, it raises shipping law issues which are within the FMC's statutory responsibilities. This case is therefore not beyond the scope of FMC jurisdiction.

### 1. Precedents recognizing the nonstatutory exemption

Judicial decisions have recognized that some labor-management agreements

---

**99.** Maritime Labor Agreements ·Act of 1980, § 6, Pub.L. No. 96–325, 94 Stat. 1021 (1980); *see* S. Rep. No. 96–854, *supra* note 82, at 15; H.R.Rep. No. 96–876, *supra* note 82, at 6.

**100.** S.Rep. No. 96–876, *supra* note 82, at 9 n.10.

**101.** *See FMC v. Pacific Maritime Ass'n, supra* note 84, 435 U.S. at 57, 98 S.Ct. at 937 (most collective bargaining agreements would be routinely approved upon filing under § 15); *cf. id.* at 61, 98 S.Ct. at 939 (distinguishing between exemption and liability issues in antitrust context); *Connell Const. Co. v. Plumbers & Steamfitters Local Union 100*, 421 U.S. 616, 637, 95 S.Ct. 1830, 1842, 44 L.Ed.2d 418 (1975) (agreement not exempt; remand for consideration of whether it violated Sherman Act).

**102.** 46 U.S.C. §§ 812, 815, 817 (1976); this case also involves the similar provisions of § 845a.

**103.** *FMC v. Pacific Maritime Ass'n, supra* note 84, 435 U.S. at 56 (exemption should not be construed broadly if impact on competition is "'neither *de minimis* nor routine'"); *id.* at 63, 98 S.Ct. at 940:

Nor are we impressed with other arguments that in one guise or another are contentions that the Commission, for lack of ability and experience, should not purport to deal with any collective-bargaining agreement but should leave the entire matter of anticompetitive labor-management contracts to the courts and the antitrust laws. * * * Congress has made the Commission the arbiter of competition in the shipping industry * * *.

*See United Stevedoring Corp. v. Boston Shipping Ass'n*, 16 FMC 7, 10 (1972) (*Boston Shipping*) (following previous Supreme Court decision broadly defining FMC jurisdiction).

are exempt from the requirements of Section 15 of the Shipping Act, 46 U.S.C. § 814 (1976). Section 15 requires regulated parties, including steamship carriers, to submit certain categories of agreements to the FMC for review and approval prior to implementation; FMC approval confers immunity from antitrust liability. A collective bargaining agreement may fall within several of the categories covered by Section 15: it may fix or regulate transportation rates or fares; control, regulate, prevent, or destroy competition; pool or apportion earnings, losses, or traffic; limit or regulate the volume or character of freight or passenger traffic to be carried; or provide for an exclusive, preferential, or cooperative working agreement.[104] Such agreements must be filed with the FMC for review under Section 15 unless they satisfy a set of criteria modeled on the nonstatutory labor exemption from the antitrust laws.[105]

Two rationales support the use of antitrust law principles as a model in Section 15 exemption cases. First, the labor exemption from antitrust regulation has been developed judicially over the course of four decades to reconcile the system of collective bargaining with the potentially inconsistent dictates of another statutory scheme[106]; hence its principles serve as a useful guide in the shipping law context.[107] Second, a labor agreement which is exempt from the antitrust laws because of its indirect impact on the commercial market might not raise Section 15 issues and would not benefit

---

104. 46 U.S.C. § 814 (1976). The FMC has the power to "disapprove, cancel or modify" any such agreement that it finds to be "unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, * * * or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter[.]" *Id.*

105. *In Volkswagenwerk Aktiengesellschaft v. FMC, supra* note 83, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090, the Supreme Court held that § 15 applied to an inter-employer agreement to implement the provisions of a labor-management agreement creating a $29 million fund to mitigate the effects of technological job displacement. Although the case did not directly involve a labor-management agreement, *id.* at 278, 88 S.Ct. at 938, it established a broad scope for § 15, *id.* at 273–276, 88 S.Ct. at 936–937.

Subsequently the FMC held that § 15 did not provide a blanket exemption for collective bargaining agreements. *Boston Shipping, supra* note 103, 16 FMC at 15. The Commission quoted Justice Harlan's concurring opinion in *Volkswagenwerk*: "I see no warrant for assuming, in advance, that a maritime agreement must always fall neatly into either the Labor Board or Maritime Commission domain; a single contract might well raise issues of concern to both." *Id.* at 13, *quoting* 390 U.S. at 286, 88 S.Ct. at 942. Instead, the FMC delineated a nonstatutory labor exemption modeled on the labor exemption from the antitrust laws. *See* discussion *infra*. The statute authorizes the FMC to exempt classes of agreements from any provision of the shipping laws. 46 U.S.C. § 833a (1976).

106. *See generally* Leslie, *Principles of Labor Antitrust*, 66 Va.L.Rev. 1183, 1192–1224 (1980).

107. The FMC relied on *Allen Bradley Co. v. Local 3, Internat'l Brotherhood of Electrical Workers*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945) (*Allen Bradley*) (exemption denied); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (*Pennington*) (exemption denied); and *Local Union # 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1607, 14 L.Ed.2d 640 (1965) (opinion of White, J., joined by two other Justices) (*Jewel Tea*) (exemption allowed). *See Boston Shipping, supra* note 103, 16 FMC at 11–12. In *Jewel Tea* the six-member majority divided evenly between the opinions of Justice White and Justice Goldberg; however, the FMC in *Boston Shipping* relied on Justice White's opinion. *Compare id.* at 12 *with Jewel Tea*, 381 U.S. at 689–690.

The Supreme Court has recognized that, although antitrust law precedents served as a model, they do not control the scope of the shipping law exemption for labor agreements: [S]ince the Shipping Act contains its own standards for exempting and for approving and disapproving agreements between carriers, and because the ultimate issue in cases such as this is the accommodation of the Shipping Act and the labor laws, rather than the labor laws and the antitrust laws, it will not necessarily be a misapplication of the statutes if the exemption for collective-bargaining contracts from Shipping Act requirements is not always exactly congruent with the so-called labor exemption from the antitrust laws as understood by the courts. *FMC v. Pacific Maritime Ass'n, supra* note 84, 435 U.S. at 63, 98 S.Ct. at 940.

from the FMC's power to grant antitrust immunity.[108]

In *United Stevedoring Corp. v. Boston Shipping Ass'n*, 16 FMC 7 (1962) (*Boston Shipping*), the FMC defined the criteria for a nonstatutory labor exemption from the shipping laws. The case involved agreements between employers to implement the provisions of a labor-management collective bargaining agreement. Recognizing the need to "reconcil[e] or accommodat[e] Shipping Act policies with labor act policies," [109] the FMC derived four "guidelines" from the Supreme Court cases exempting labor agreements from antitrust regulation. First, the underlying collective bargaining must be in good faith and at arm's length.[110] Second, the matter must be "intimately related or primarily and commonly associated with a bona fide labor purpose." [111] Third, the result of the collective bargaining must not "impose terms on entities outside of the collective bargaining group." [112] Fourth, there must be no conspiracy between labor and management.[113] The FMC noted that "[t]hese criteria are by no means meant to be exclusive nor are they determinative in each and every case. * * * They are rather guidelines or 'rules of thumb' for each factual situation." [114] The FMC expressly adopted a case-by-case balancing test, weighing the agreement's effect on business against its impact on collective bargaining.[115]

Applying these standards, the Commission then found that the inter-employer

---

**108.** *FMC v. Pacific Maritime Ass'n, supra* note 84, 435 U.S. at 53, 58, 98 S.Ct. at 935, 937.

**109.** *Boston Shipping, supra* note 103, 16 FMC at 10.

**110.** *Id.* at 13. The FMC cited *Allen Bradley, supra* note 107, a case in which unions and management agreed to create and enforce a local monopoly in electrical equipment, and *Pennington, supra* note 107, in which the UMW and the larger coal mine companies reached agreement that the unions would impose high wages and royalties on all companies, allegedly for the purpose of eliminating smaller operators from the industry. The Supreme Court denied antitrust exemptions in both cases. In contrast, in *Jewel Tea, supra* note 107, the Court granted the exemption in a case which "comes to us stripped of any claim of a union-employer conspiracy * * *." 381 U.S. at 688.

**111.** *Boston Shipping, supra* note 103, 16 FMC at 12–13. The FMC paraphrased Justice White's discussion in *Jewel Tea, supra* note 107, which determined that the challenged restriction, "like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies * * * falls within the protection of the national labor policy * * *." 381 U.S. at 689–690, 85 S.Ct. at 1601–1602. *Cf. Pennington, supra* note 107, 381 U.S. at 664–665, 85 S.Ct. at 1590 (legitimate subject of union concern, such as wages, is a necessary but not sufficient condition for antitrust law exemption; "because they must bargain does not mean that the agreement reached may disregard other laws").

**112.** *Boston Shipping, supra* note 103, 16 FMC at 13. This criterion distinguishes between separate union-management agreements which establish similar wages and working conditions, thereby affecting competition *indirectly* through their impact on costs, prices, and profits, *see Jewel Tea, supra* note 107, 381 U.S. at 688, 85 S.Ct. at 1601; *Pennington, supra* note 107, 381 U.S. at 664, 85 S.Ct. at 1590, *citing Apex Hosiery Co. v. Leader*, 310 U.S. 469, 503–504 (1940), and labor-management conspiracies to drive the employers' competitors out of business by imposing specified terms *directly* upon them, *see Pennington, supra* note 107, 381 U.S. at 665–668, 85 S.Ct. at 1590.

**113.** *Boston Shipping, supra* note 103, 16 FMC at 13. *See* note 110 *supra*.

**114.** *Boston Shipping, supra* note 103, 16 FMC at 12.

**115.** *Id.* at 13. The Commission wrote:

> The impact upon business which this activity has must then be examined to determine the extent of its possible effect upon competition, and whether any such effect is a direct and probable result of the activity or only remote. Ultimately, the relief requested or the sanction imposed by law must then be weighed against its effect upon the collective bargaining agreement. * * *

*Id.* This balancing test echoed Justice White's approach in *Jewel Tea, supra* note 107, 381 U.S. at 690 n.5, 85 S.Ct. at 1602 n.5: "The crucial determinant is not the form of the agreement * * * but its relative impact on the product market and the interests of union members." *See* Leslie, *supra* note 106, 66 Va. L.Rev. at 1184, 1217 (criticizing uncertainty created by *ad hoc* balancing test in antitrust law).

agreements at issue in *Boston Shipping* were exempt from the shipping acts. First, the incorporation papers and by-laws creating a multi-employer collective bargaining association were exempt because they involved "purely labor matters"; "no valid regulatory purpose would be served" by requiring Section 15 review.[116] Second, an agreement regarding initial allocation of labor gangs among stevedores was exempt because "in actuality [it] amounted to nothing more or less than the hiring by employers of employees." Labor considerations were "strong," while the effects upon competition in the industry were "minimal and remote."[117] Third, a "first call-recall" agreement, which created procedures for assignment and reassignment of employees, satisfied all four guidelines; the FMC expressly noted that "no terms were imposed on entities outside the collective bargaining group."[118]

In *FMC v. Pacific Maritime Ass'n*, 435 U.S. 40, 98 S.Ct. 927, 55 L.Ed.2d 96 (1978), the Supreme Court cited these guidelines with approval. The Court declined to confer a categorical Section 15 exemption on all collective bargaining agreements,[119] deferring to Congress' determination to

" 'subject to the scrutiny of a specialized governmental agency the myriad of restrictive agreements in the maritime industry.' "[120] The Court, however, accepted the FMC's guidelines for exempting some cases from pre-implementation review. Quoting the *Boston Shipping* decision at length,[121] the Court held that the guidelines were not satisfied by the Pacific Maritime Association's collective bargaining agreement with the union. The agreement allowed employers outside the collective bargaining group to participate in the group's hiring halls and centralized fringe benefit plans only on specified terms.[122] "PMA and the Union," the Court noted, "had undertaken to impose employment terms and conditions on employers outside the bargaining unit," thereby eliminating a competitive advantage previously enjoyed by nonmembers.[123]

### 2. The Rules on Containers and the labor exemption

■ The FMC advances two grounds for denying a labor exemption for the Rules on Containers as incorporated into the PRMSA tariff. First, it contends that the nonstatutory labor exemption applies only to Section

116. *Boston Shipping, supra* note 103, 16 FMC at 13–14.

117. *Id.* at 14.

118. *Id.* at 14–15. The "first call-recall" agreement was embodied in a collective bargaining agreement as well as in an inter-employer agreement.

119. 435 U.S. at 53–60, 98 S.Ct. at 935–939. This court held that any collective bargaining agreement, whatever its impact on competition, was exempt from filing with the FMC under § 15. *Pacific Maritime Ass'n v. FMC*, 543 F.2d 395 (D.C.Cir.1976), *rev'd*, 435 U.S. 40, 98 S.Ct. 927, 55 L.Ed.2d 96 (1978).

120. 435 U.S. at 56, 98 S.Ct. at 936, *quoting Volkswagenwerk Aktiengesellschaft v. FMC, supra* note 105, 390 U.S. at 276, 88 S.Ct. 929, 19 L.Ed.2d 1090.

121. 435 U.S. at 51 n.15, 98 S.Ct. at 934 n.15 (lengthy quote from *Boston Shipping); see id.* at 63, 98 S.Ct. at 940 (Commission's nonstatutory exemption demonstrates "sensitivity to the national labor policy").

122. Prior to the agreement, nonmember employers had negotiated agreements with the union whose terms were sometimes more flexible and more advantageous to the employers than the terms of union-PMA agreements. Nonmember employers were also permitted to enter into separate agreements with PMA to secure their work force through PMA-union hiring halls and to participate in the fringe benefit plans administered by PMA. *Id.* at 46–47, 98 S.Ct. at 931–932. During the 1970 contract negotiations PMA sought to eliminate nonmember participation in the hiring halls and benefit plans in order to encourage nonmembers to join PMA. The parties reached a compromise. PMA accepted continued nonmember participation on the condition that participating nonmembers would be required to agree to pay the same dues and assessments as PMA members, follow the same work rules, and "be treated as a member during work stoppages." *Id.* at 47, 98 S.Ct. at 932.

123. *Id.* at 62, 98 S.Ct. at 940.

15, and not to any other provisions of the shipping laws.[124] Second, it asserts that, assuming *arguendo* that there is a labor exemption from the substantive provisions and that it applies to tariffs as well as to agreements, the Rules on Containers do not satisfy the *Boston Shipping* criteria.[125] We find the second contention persuasive and therefore need not reach the first issue.[126]

One of the four *Boston Shipping* guidelines[127] permits a labor exemption only if "[t]he result of the collective bargaining does not impose terms on entities outside of the collective bargaining group."[128] Although none of the criteria is "determinative,"[129] consideration of each factor facilitates the balancing of an agreement's effect on the business market against its impact on collective bargaining.[130] If an agreement "impose[s] terms" on employers or customers outside of the collective bargaining group, then its effect on shippers' interests and on competition[131] is likely to

---

**124.** Respondents' brief at 40–45.

**125.** *Id.* at 48–58. The Commission recognizes the applicability of the *Boston Shipping* criteria to the tariff rules in question. "While the four specific *Boston Shipping* criteria were designed to guide the application of a labor exemption to agreements under section 15, especially collective bargaining agreements, and therefore their language does not precisely apply to an implementing tariff filed unilaterally by a carrier," the Commission argued, "the principles underlying them and the 'final analysis' do apply." Respondents' brief at 48–49. The Commission further argued that, because the tariff imposed terms on non-parties, "*PMA* controls this case, and properly so * * *." *Id.* at 51–52. We agree with the Commission, notwithstanding the dissent's assertion of the "inappositeness of applying that rationale [the *PMA* test] concerning a collective bargaining agreement to this case involving a tariff." Dissent at 4.

**126.** The general rationale for the § 15 exemption—the need to harmonize two potentially conflicting statutory schemes by eliminating overlapping jurisdiction in appropriate cases—would support recognition of a nonstatutory labor exemption from the substantive provisions of the shipping laws. In *FMC v. Pacific Maritime Ass'n, supra* note 84, the Supreme Court appeared to recognize the broad purposes of the labor exemption, although it also found that they did not require a categorical § 15 exemption. 435 U.S. at 57–58, 63, 98 S.Ct. at 937, 940 (commending FMC's "sensitivity to the national labor policy by exempting from the filing requirements all collective-bargaining contracts that in its view would also be exempt from the antitrust laws"). If sensitivity to the national labor policy justifies relieving certain labor agreements from the burdens of pre-implementation filing, it might also support relief from protracted adjudication before the FMC and the courts concerning the legality of these agreements. However, the discussion in the majority opinion does not provide guidance on this issue. In contrast, the dissent assumed that there would be no exemption from the substantive provisions of the shipping laws. *Id.* at 68–69, 77, 98 S.Ct. at 943, 947. This position provides no basis for inferring that the majority of the Court would have denied the existence of any exemption from the substantive sections; the majority and the dissent adopted two entirely different criteria for delineating the FMC's jurisdiction. The dissent drew the line between prior restraint of collective bargaining agreements by the FMC, which it wished to avoid, and subsequent review, which it was willing to permit in all cases. The majority, on the other hand, permitted prior review in some cases but exempted agreements fulfilling the *Boston Shipping* guidelines. If the issue were raised, the Court might extend the *Boston Shipping* criteria to the substantive shipping law provisions. We need not decide the question in this case.

**127.** The Rules on Containers appear to satisfy the other three *Boston Shipping* guidelines. First, the history of labor-management confrontation between the steamship companies and the ILA makes clear that the bargaining was at arm's length. *See* discussion in Part I–A *supra*. Second, work preservation is "intimately related" to "a bona fide labor purpose." *See Nat'l Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 642, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357 (1967). Third, there is no evidence of conspiracy between labor and management; the interests of the two sides are fundamentally different. *See* text at notes 10–34 *supra*.

**128.** *FMC v. Pacific Maritime Ass'n, supra* note 84, 435 U.S. at 51 n.15, 98 S.Ct. at 934 n.15; *Boston Shipping, supra* note 103, 16 FMC at 13.

**129.** *Id.* at 12.

**130.** *FMC v. Pacific Maritime Ass'n, supra* note 84, 435 U.S. at 61, 98 S.Ct. at 939.

**131.** Although the antitrust cases speak solely of an agreement's effect on competition, the Supreme Court has recognized the need to adapt the antitrust labor exemption criteria to the shipping law context. *See* note 107 *supra*. In antitrust law, imposition of terms on the employer's business competitors may deprive a

be "direct and probable" rather than "remote," and it will probably implicate significant shipping law policies. Generally, therefore, such an agreement will fall within the jurisdiction of the Federal Maritime Commission.

The Rules on Containers, as incorporated into the PRMSA tariff, directly impose terms on third parties.[132] As in *Pacific Maritime Association*, the shipping employers agreed not to deal with outsiders except upon terms and conditions specified in the collective bargaining agreement. In *Pacific Maritime Association* employers outside the bargaining unit were required to accept uniform contract conditions with longshoremen in order to enjoy the benefits of participation in hiring halls and fringe benefit plans. In our case consolidators and other shipping customers are required to accept the PRMSA tariff Rules on Containers in order to obtain ocean transportation services.[133]

Moreover, the Rules have direct and probable effects on shippers' interests and on

competition in the shipping industry, both of which are subject to FMC regulation. The record fully documents the impact that enforcement of the Rules would have on importers, exporters, consolidators, distributors, and others who transport goods by sea.[134] Consolidators are competitors as well as customers of the steamship lines, offering alternative arrangements for ocean transportation of smaller shipments. Those consolidating companies which previously operated within the 50-mile zone are deprived of business under the Rules, or subjected to substantial cost increases and shipping delays, in order to preserve the work opportunities of longshoremen employed at the docks by steamship operators. We take no position on whether the Rules are legal, but we are unable to conclude that the shipping interests are either indirect or insignificant in relation to collective bargaining factors.[135] Therefore, the FMC has jurisdiction to consider the legality of the Rules on Containers under the shipping laws.[136]

labor-management agreement of an exemption. In the shipping context the regulatory scheme protects shipping customers as well as competitors. An agreement should not be exempt when terms are imposed either upon the employer's competitors or upon the employer's shipping customers.

**132.** The tariff sets forth the terms and conditions upon which shippers and consignees may deal with the carrier. *See* note 96 *supra*.

**133.** In both cases the third parties were not compelled to deal with the shipping employers, but failure to do so would have adverse economic effects; on the other hand, the standardized terms imposed significant burdens on the third parties.

**134.** *See* discussion in Part I–A and Part I–B *supra*.

**135.** Petitioners maintain that, even if the Rules on Containers have direct effects on shipping interests, these effects are also unavoidable and should not disqualify the Rules for an exemption. The Supreme Court, however, has held that the FMC has jurisdiction in all cases in which terms are imposed directly upon third parties. *See FMC v. Pacific Maritime Ass'n, supra* note 84. The necessity of the collective bargaining provisions at issue is a factor the FMC should consider in making its substantive determination of legality. *See* 435 U.S. at 57,

63, 98 S.Ct. at 937, 940; *New York Shipping Ass'n v. FMC, supra* note 84, 495 F.2d at 1222.

**136.** The cases cited by petitioners in support of a contrary proposition, petitioners' brief at 44–45, are inapposite. The legality of a work-preservation agreement under the labor laws, *id.* at 44–46, is a separate issue from its eligibility for exemption from FMC shipping law jurisdiction. *See NLRB v. Internat'l Longshoremen's Ass'n, supra* note 4, 447 U.S. at 512, 100 S.Ct. at 2318; discussion in Part II–A *supra*.

The criteria for a labor exemption from the antitrust laws, also relied upon by petitioners, petitioners' brief at 46–48, are not identical to those for a labor exemption from the shipping laws. *See* notes 107 & 131 *supra*. For example, even though courts do not agree on whether imposition of terms outside the bargaining unit is sufficient to defeat an antitrust law exemption, respondents' brief at 53–54, *FMC v. Pacific Maritime Ass'n, supra* note 84, 435 U.S. at 61–63, 98 S.Ct. at 939–940, makes clear that imposition of terms on third parties disqualifies an agreement from exemption under the shipping laws. Therefore, even if the Rules are exempt from antitrust scrutiny, as one Court of Appeals has held, *see Intercontinental Container Transport Corp. v. New York Shipping Ass'n*, 426 F.2d 884, 888 (2d Cir. 1970), they might not be exempt from the shipping laws, and vice versa.

## III. CONCLUSION

We remand the record in this case to the Federal Maritime Commission for reconsideration of its decision on the merits. The Initial Decision in this case was rendered in October 1975, more than six years ago. In June 1978, more than three years ago, the FMC adopted the Initial Decision. The Commission did not examine the implications of two recent Supreme Court decisions, *FMC v. Pacific Maritime Ass'n, supra*, which asserts the importance of labor policy in reaching substantive shipping law decisions, 435 U.S. at 57, 63, 98 S.Ct. at 937, 940, and *NLRB v. Internat'l Longshoremen's Ass'n*, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980), which discusses the role of collective bargaining in resolving the problems created by technological job displacement. In the interests of justice, the FMC should have the opportunity to reconsider its previous determination in light of these two decisions.

The record in this proceeding is therefore *Remanded*.

MacKINNON, Circuit Judge (concurring in part and dissenting in part).

The majority opinion holds that the Federal Maritime Commission (FMC or Commission) has jurisdiction to determine whether shippers' tariffs that incorporate the Rules on Containers violate the common carrier requirements of the shipping laws. At 180. I concur in this part of the opinion and in so doing reject the claim of the Council of North Atlantic Shipping Associations and the New York Shipping Association (Petitioners) that the validity of the attempts at work preservation embodied in the collective bargaining agreement between Petitioners and the International Longshoremen's Association (Union) is to be determined solely under the National Labor Relations Act and specifically under sections 158(b)(4)(B) and (e) of that Act.[1] Also with respect to the Maritime Labor Agreements Act of 1980, Pub.L.No. 96–325, 94 Stat. 1021 (1980) (MLAA), I concur in the interpretation that collectively bargained work preservation agreements were not thereby excluded from the *jurisdiction* of the Maritime Commission. At 181.

I disagree, however, with the suggestion in *dictum* in a footnote[2] that the general rationale of the exemption for labor agreements from the *filing* requirements of section 15 of the Shipping Act, mandated by the MLAA, supports a nonstatutory labor exemption from the *substantive* provisions of the shipping laws. The majority suggests that the Supreme Court "might extend the *Boston Shipping* [*United Stevedoring Corp. v. Boston Shipping Ass'n*, 16 FMC 7 (1972)] criteria to the substantive shipping law provisions." I find no evidence for that speculation in the decisions of the Court. Moreover, the MLAA itself indicates that such an extension of the labor exemption was rejected by Congress when it considered the scope of the exemption it was granting in the MLAA and *specifically rejected* its extension to the substantive shipping laws in precise language as follows:

> Sec. 5. Section 45 of the Shipping Act, 1916 (46 U.S.C. 842), and all references thereto, is redesignated section 46 and a new section is added as follows:
>
> "Sec. 45. The provisions of this Act and the Intercoastal Shipping Act, 1933, shall not apply to maritime labor agreements and all provisions of such agreements except to the extent that such provisions provide for the funding of collectively bargained fringe benefit obligations on other than a uniform man-hour basis, regardless of the cargo handled or

Finally, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), cited in petitioners' brief at 50–55, a case dealing with Interstate Commerce Commission and National Labor Relations Board jurisdiction over "hot cargo" agreements, reversed the ICC's choice of remedy. However, it expressly acknowledged the ICC's authority to enforce the common carrier obligations imposed by the Interstate Commerce Act against carriers constrained by labor agreements. *See id.* at 173–174, 83 S.Ct. at 248.

1. 29 U.S.C. § 158(b)(4)(B) and (e) (1976).

2. Maj. op. at 187 n.126.

type of vessel or equipment utilized. *Notwithstanding the preceding sentence, nothing in this section shall be construed as providing an exemption from the provisions of this Act or of the Intercoastal Shipping Act, 1933 for any rates, charges, regulations, or practices of a common carrier by water or other person subject to this Act which are required to be set forth in a tariff, whether or not such rates, charges, regulations, or practices arise out of, or are otherwise related, to a maritime labor agreement.".*

Pub.L.No. 96–325, § 5, 94 Stat. 1022 (1980) (emphasis added).

This enactment confirms the prior interpretation of the Shipping Act. In application, it means that the FMC *has jurisdiction* to apply the substantive provisions of the shipping laws to tariffs that incorporate the terms of collective bargaining agreements. Thus, regardless of the source of the tariff's terms,

> Whenever the Federal Maritime Commission finds that any rate, fare, charge, classification, tariff, regulation, or practice demanded, charged, collected, or observed by any carrier subject to the provisions of this chapter is unjust or unreasonable, it may determine, prescribe, and order enforced a just and reasonable maximum or minimum, or maximum and minimum rate, fare, or charge, or a just and reasonable classification tariff, regulation, or practice:

46 U.S.C. § 845a (1976).

While the statement of the majority in footnote 126 is therefore purely dictum I am concerned lest it be given more weight than its soundness warrants. The FMC should ignore such comment because it is not soundly based in the statute, legislative history or adjudicated cases.

My principal disagreement with the majority opinion, however, is with its statement of the principle it relies upon to control this case. It asserts that the Supreme Court's 1978 holding in *Federal Maritime Commission v. Pacific Maritime Ass'n (PMA)*, 435 U.S. 40, 98 S.Ct. 927, 55 L.Ed.2d 96 (1978), is based on the principle that "an *agreement* is not exempt if it *directly* imposes terms on persons or entities outside the agreement." At 183 (emphasis added). There are at least two serious difficulties with the application of this rule in the instant case.

First, it fails to discuss the issue—strenuously argued by the intervenors—whether one can legally equate the Rules on Containers set forth in the *collective bargaining agreement* between the Union and the carriers with those same Rules *as incorporated into the carriers' tariffs.* The failure even to consider this point is evident from the majority's statement of the test: an *"agreement"* is not exempt if it imposes terms *"directly"* on third parties. While the collective bargaining agreement may in some sense, because it includes the Rules, "impose" terms on shippers, *it is not that agreement which is under scrutiny here.* Rather, it is the *ocean tariffs* filed by the carriers.

Therefore, posing the test in terms of the "direct" effect of the *"collective bargaining agreement"* misstates the issue. The question presented to the Commission for consideration was either (a) the *indirect* effect the *agreement* has when its terms are included in a carrier's tariffs, or (b) the *direct* effect of the *tariffs.* The statement by the majority as to the applicable standard has one foot in each trough, and the result is bound to be hopelessly confusing if the courts or the FMC should attempt to apply it.

When one attempts to figure out how this apparently superficial flaw can be straightened out—by replacing "agreement" with "tariff," or by substituting "indirectly" for "directly"—it becomes apparent that the whole basis for the majority's statement of the controlling law is questionable. The problem is not a superficial one. It is the fundamental one of trying to use the *PMA* decision as authority for a premise the importance of which deserves thorough independent justification.

*PMA* involved the issue of whether there was a blanket exemption for *collective bargaining agreements themselves* from the

*filing* requirements of section 15 of the Shipping Act. A panel of this court (Wright, McGowan, Tamm, JJ.) held that there *was* a blanket exemption, because to require pre-implementation approval of labor-management contracts by the FMC would frustrate national labor policy favoring the quick resolution of labor disputes. The Supreme Court *reversed* that decision, holding that there was no *per se* exemption; rather, the Commission had jurisdiction at a minimum to require prior filing and approval of agreements whose impact on competition was "neither *de minimis* nor routine." 435 U.S. at 56, 98 S.Ct. at 936. It is this phrase that the majority says controls here.

The rationale disapproved by the Supreme Court in reversing *PMA* should suggest the inappositeness of applying that rationale concerning a collective bargaining agreement to this case involving a tariff. This court's reasoning, which was based upon the need to avoid, not even the substantive law, but merely a pre-implementation *procedure*—was explicitly rejected. Therefore, while *PMA* supports the very general proposition that *labor agreements* are to some extent subject to FMC scrutiny, it says little if anything about the Commission's role in evaluating *tariffs* derived from such agreements against the substantive provisions of the Shipping Act.

There is a very substantial distinction between collective bargaining agreements (which *PMA* held may or may not be exempt from *pre-implementation* scrutiny) on the one hand, and tariffs on the other. This distinction was brought to the attention of Congress in hearings on the MLAA both by the FMC [3] *and* by the Union; [4] the result was the explicit distinction in section 5 of the MLAA between maritime labor agreements and matters "required to be set forth in a tariff." As intervenors rightly suggest, to ignore the distinction would be to reduce the incentive of a carrier—even one bargaining at arm's length—to bargain for labor agreements that are consistent with the Shipping Act's policies.

It must be remembered that the Shipping Act has as its primary purpose the protection of *shippers,* not carriers. From the standpoint of the shipper, the terms set forth in a tariff are the same regardless of whether they had their genesis in a collective bargaining agreement; the tariff is the only statement of terms imposed "directly" upon the shipper. National labor policy, while it may require that the FMC be kept out of the labor-management bargaining process, does not prohibit the FMC from applying the substantive provisions of the Shipping Act to protect shippers from being forced to bear the costs of carriers' losses at the bargaining table merely because they were incorporated in a collective bargaining agreement.

I thus cannot join the majority's statement of the controlling law.[5] The tariffs at issue in this case are subject to the substantive shipping laws, not because they arise out of a collective bargaining agreement that falls short of complete exemption from scrutiny, but simply because they *are tariffs* subject to FMC review. Although it may ultimately be demonstrated that the principles underlying *PMA* are applicable to cases involving the evaluation of tariffs under the substantive shipping laws, I cannot agree that *PMA* "controls" these cases.

---

**3.** Vice Chairman Moakley stated that "Under the present law, the tariff stands on its own and must be defended *as a tariff." Hearings Before the Subcomm. on Merchant Marine and Tourism of the Senate Comm. on Commerce, Science and Transportation on H.R. 6613*, 96th Cong., 2d Sess. 12 (1980) (emphasis added).

**4.** President Gleason of the International Longshoremen's Association stated that "this union does not talk about tariffs. I think that is the companies' business ..." *Id.* at 33.

**5.** The majority states that the Commission itself urged the applicability of *PMA* in arguing the present case. At 187 n.125. The Commission did not, however cite any decisions in which it has previously adopted this interpretation. In view of the testimony of Vice Chairman Moakley in the MLAA hearings, *see* note 3 *supra,* I question whether the Commission would upon a thorough consideration of the matter view *PMA* as controlling cases of the present kind.

Ultimately, I agree with the majority that assuming *arguendo* that a labor exemption is applicable here, the tariffs would still be within the FMC's jurisdiction under *Boston Shipping*. At 187–188. I therefore concur in upholding the FMC's exercise of its jurisdiction here.

I disagree, however, that it is either necessary or desirable that this case be remanded for further consideration. It is correct that the decision by the FMC was rendered some time ago; but one of the principal reasons for our delay was the stay the parties requested because of a pending case, *NLRB v. International Longshoremen's Ass'n*, 613 F.2d 890 (D.C.Cir.1979), *aff'd*, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980).[6] That decision has now been released, and its failure to consider any question at issue here is grounds for *not* remanding the case. Indeed, both *PMA, supra*, and *International Longshoremen's Ass'n, supra*, have been decided since the FMC decision, but there is nothing in either decision that would cause the FMC to consider any questions of fact or law not previously considered and ruled upon. *International Longshoremen's Association* dealt solely with the work preservation issue under the *labor law*. Although petitioners do not concede that the Rules as incorporated into carrier tariffs violate the substantive shipping laws, they have chosen to limit their argument to the jurisdictional issue. We have no reason to believe that the Commission erred in applying the law as it stood at the time of its decision, and no reason to believe that law has since changed in any material respect. Consequently, returning the matter to the Commission for further proceedings can serve no useful purpose. I therefore dissent from the court's decision to remand the case.

**6.** This case was first postponed on motion of the Commission while *International Longshoremen's Association* was pending in this court. It was postponed a second time, this time at petitioners' instance, when the Supreme Court granted review of that decision.